Richard **ZOLMAN** and Lyman Zolman,
Plaintiffs–Appellants,

v.

**SEMO PRODUCE, INC.**, Defendant–
Respondent.

No. 18889.

Missouri Court of Appeals,
Southern District,
Division One.

May 5, 1994.

Barbara A. Godley, Welman, Beaton, Williams & McVey, Kennett, for appellants.

John T. McMullan, Pelts, Stokley & Turnbow, Kennett, for respondent.

PARRISH, Chief Judge.

Richard Zolman and Lyman Zolman (plaintiffs) appeal a judgment against SEMO Produce, Inc., (SEMO) for breach of an oral contract. This court affirms.

This case was tried without a jury. Its review is governed by Rule 73.01.

> The decree of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

*Compton v. Cain,* 829 S.W.2d 75, 76 (Mo. App.1992). There was no request for findings of fact or conclusions of law and the trial court made none. Accordingly, this court considers all fact issues as being resolved in accordance with the result reached. Rule 73.01(a)(3). "[T]his court accepts as true the evidence and permissible inferences favorable to the judgment and disregards contra-

dictory evidence." *Luna v. Smith*, 861 S.W.2d 775, 780 (Mo.App.1993).

Plaintiffs are partners in a farming operation. They have grown watermelons since 1980. SEMO is a produce broker. During the summer season, SEMO's primary business is selling watermelons. It has engaged in that business since 1978. During the summer of 1992, and for several seasons prior to 1992, plaintiffs sold the watermelons they raised through SEMO. They had no written contract. Their business dealings were based on oral agreements.

In 1992 when plaintiffs' first crop of watermelons was ready for sale, Lyman Zolman called Bud Henderson, president of SEMO. Mr. Zolman explained:

Q. [by Mr. Zolman's attorney] What was that conversation?

A. I just called him up and just asked him if he was buying any watermelon, and he said yes. I asked him how much he was paying, and he said three cents a pound.

Q. You called him on the telephone, and you contacted him at his place of business?

A. Yes, ma'am.

Q. And, again, the price was how much?

A. Three cents.

Q. Okay. Do you remember the approximate date of that conversation?

A. Not really. It was probably a day that—The day the first load was loaded, I imagine.

Q. Was it before any melons were loaded?

A. Yes, ma'am.

When plaintiffs sold watermelons through SEMO's brokerage, SEMO provided a truck and a stacker. Plaintiffs provided a crew and equipment for removing the watermelons from the field. The crew hauled the watermelons from the field on a trailer. The crew handed the watermelons from the trailer used to bring them from the field to the stacker on the truck. The stacker placed the watermelons on the truck.

SEMO sold watermelons throughout the northern section of the United States. From July 16, 1992, through August 16, 1992, SEMO took 23 loads of watermelons from plaintiffs' fields and delivered them to buyers.

On July 28, 1992, SEMO began paying two and one-half cents per pound. Plaintiffs claim they were not advised that the price had dropped from three cents per pound and they did not agree to the lesser price. On an occasion prior to when SEMO began paying two and one-half cents per pound for watermelons, Lyman Zolman heard rumors that the price of watermelons was dropping. He called Bud Henderson and inquired. At that time, Mr. Henderson told Mr. Zolman that SEMO was paying three cents per pound. Mr. Zolman did not recall the date of his telephone conversation with Bud Henderson; however, his recollection was that the telephone conversation occurred at a time "close to" the date when SEMO began paying two and one-half cents per pound.

Bud Henderson recalled Lyman Zolman calling from a cafe at Arbyrd, Missouri, "about two days before [the price] had dropped." Mr. Henderson testified that the day Mr. Zolman called from the cafe, a load of watermelons was being loaded from plaintiffs' fields; that his conversation was about that load of watermelons. Mr. Henderson told Mr. Zolman, "Lyman, as far as I know, we got this one here sold on the three." He explained, "That did not mean that it would be three cents for the remainder, you know, of the season."

Bud Henderson testified that SEMO had never contracted with plaintiffs for a specific price at the start of a growing season that extended to all watermelons purchased that year. Usually, the price of watermelons declines toward the end of the summer.

When SEMO takes a load of watermelons from a farmer's field it assigns a load number. SEMO maintains records for each load number. "It's got a load number. It's on a master book at Semo. It's got the farmer, the crew what did load it, the trucker, the trucker driver's—the license number of the truck and the trailer, where it went." When SEMO receives a check paying for a load of

watermelons, a copy of the check is placed in the file. SEMO's commission is "a penny a pound." Bud Henderson explained:

Q. [by SEMO's attorney] Let me ask you this. Had the price, at the end of the season, for some reason, gone to three and a half cents, then would Mr. Zolman have received additional profit for his melons?

A. Very definitely.

Q. All right. And you would not, I under—As I understand, you would have paid whatever the market price was; and that would have cost you, then, three and a half cents had the price gone up to three and a half rather than gone down to two and a half?

A. Right. . . .

Q. But what I'm stating is, your margin of profit would basically have been the one cent margin that you've—

A. Right. Right.

Q. —explained whether the price had gone down to one and a half cents or gone up to three and a half cents; is that correct?

A. That is correct.

Q. All right. You're not a speculator?

A. We're not a speculator to a big degree.

Q. All right. And in your past dealings with Mr. Zolman, you've never been a speculator; it that correct?

A. Never been a speculator.

Bud Henderson explained that some loads of watermelons are rejected by buyers upon delivery; that their quality upon delivery may not be acceptable to a buyer. He explained what occurs when he is notified that a load of watermelons has been rejected:

I've got two options. Let's get a federal [inspection] on it, and I do. And if they don't pass the federal, well, I've got—My first reaction is to get the company there that they're at to work them—say, please unload them, take them out, do the best you can with them, sort out the bad ones; but try to help me because I don't want to put more freight and take another day delay on the truck.

Mr. Henderson was asked the following questions and gave the following answers:

Q. [by plaintiffs' attorney] Are you telling me, Mr. Henderson, that when the federal inspections shows [sic] that less than 20 percent of the melons are bad—

A. They're bad.

Q. —that you will allow the whole load to be rejected?

A. I don't have no choice. They reject them. You have to get on your knees to get them to unload them if they—if they don't pass a federal inspection.

Q. And you expect Mr. Zolman, then, to expect no money for that load?

A. I—That's exactly right.

David Henderson was SEMO's vice president and bookkeeper. He talked to Lyman Zolman from time to time during the watermelon season in 1992. Mr. Zolman would come to SEMO's offices to pick up checks as partial payments for watermelons sold through the brokerage. David Henderson told of discussing falling prices of watermelons with Mr. Zolman. On one occasion the market had dropped one-half cent. David Henderson told Mr. Zolman that the market had dropped. He was asked if he told Mr. Zolman anything that could have caused Mr. Zolman to believe that SEMO was going to continue paying the prices it had paid before the market went down. David Henderson answered that he had not.

Throughout the watermelon season, plaintiffs requested and were paid partial payments for the watermelons they sold through SEMO. As of October 1, 1992, plaintiffs had received $18,000 from SEMO. At the end of the season, SEMO provided plaintiffs with a settlement form. It listed the dates truckloads of watermelons were taken from plaintiffs' fields; the load numbers assigned to those loads; the weight of the watermelons that were loaded; the weight of the watermelons delivered to buyers; the rate per pound that plaintiffs were to receive from each load sold; and plaintiffs' net proceeds per load. Two loads, Nos. 3292 and 3302, reflected net losses to plaintiffs. David Henderson explained that these loads had been rejected and that plaintiffs had been

charged freight of $611.90 on No. 3292 and $920.03 on No. 3302.

The settlement form showed the amount plaintiffs were entitled to receive for the watermelons they sold through SEMO. The partial payments paid throughout the year were deducted from the total sales. The amount shown as owed by SEMO to plaintiffs was $1,767.00.

Plaintiffs contend they were to receive three cents per pound for the watermelons they sold. Nine of the 23 loads plaintiffs sold were priced at two and one-half cents per pound. Plaintiffs also complained that the amounts SEMO calculated were based on delivered weight. Plaintiffs contend the calculation should have been based on loaded weight. According to plaintiffs' calculations, they should have been paid $30,610.50. SEMO's calculations showed $19,767.00 as the amount plaintiffs were entitled to receive. The trial court granted judgment for plaintiffs in the amount of $1,531.93, the amount of freight on the two rejected loads for which the settlement showed losses by plaintiffs.

Plaintiffs present one point on appeal. They contend the trial court erred in failing to award damages of $10,843.50, i.e., the difference between $30,610.50, the amount plaintiffs claimed they were to be paid, and $19,767.00, the amount shown due to plaintiffs on SEMO's settlement form. Plaintiffs contend "there was no evidence to support a finding of any contingency or condition to the oral agreement which would have allowed the [trial] court to find a reduced amount due to plaintiffs from [SEMO]."

SEMO argues that there was no binding, season-long agreement. Rather, according to SEMO, there was a series of 23 independent transactions during the course of the watermelon season. The arrangement to sell each truckload of watermelons was a separate transaction. SEMO contends that its method of dealing with plaintiffs was established by prior course of dealing and industry usage of trade; that the nature of its business as a produce broker required a series of agreements that ran throughout the course of the watermelon season.

The Uniform Commercial Code, as adopted in Missouri, applies to issues raised in this appeal. Article 2, the "Uniform Commercial Code—Sales", i.e. §§ 400.2–101 through 400.2–210,[1] relates to transactions in goods. *See* §§ 400.2–101 and .2–102.

(1) **"Goods"** means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. **"Goods"** also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 400.2–107).

(2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are **"future"** goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

§§ 400.2–105(1) and (2).

■■■ Existing crops that are capable of identification for purposes of sale are "goods." *Cargill Inc. v. Hale,* 537 S.W.2d 667, 668 (Mo.App.1976). The watermelons plaintiffs sold to SEMO were "goods."

Sections 400.2–208(1) and (2) provide:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course. of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 400.1–205).

1. References to statutes are to RSMo 1986 unless otherwise stated.

Section 400.1–205, to which reference is made in § 400.2–208(2), is part of general provisions in the Uniform Commercial Code. It includes:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

(5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.

§§ 400.1–205(1)–(5).[2] And, in § 400.1–201, RSMo Supp.1991, also part of the general provisions of the Uniform Commercial Code

as adopted in Missouri, "Agreement" and "Contract" are defined as follows:

"Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this chapter (sections 400.1–205 and 400.2–208). Whether an agreement has legal consequences is determined by the provisions of this chapter, if applicable; otherwise by the law of contracts (section 400.1–103). (Compare "Contract".)

§ 400.1–201(3), RSMo Supp.1991.

"Contract" means the total legal obligation which results from the parties' agreement as affected by this chapter and any other applicable rules of law. (Compare "Agreement".)

§ 400.1–201(11), RSMo Supp.1991.

In this case, plaintiffs and SEMO had business dealings over the course of the 1992 watermelon season—plaintiffs sold 23 loads of watermelons to buyers procured by SEMO from July 16 through August 16—and for several seasons prior to 1992. There was an established course of dealing between the parties. "A court should look to course of dealing to supplement or qualify the terms of an agreement where the parties are or should be aware of that course of dealing." *Prewitt v. Numismatic Funding Corp.*, 745 F.2d 1175, 1178 (8th Cir.1984), citing § 400.1–205(3), RSMo 1969.[3]

The parties agree as to certain express terms of their oral agreement. Plaintiffs were required to provide a crew and equipment for picking and removing watermelons from their fields. SEMO was required to provide a truck, driver and a stacker for purposes of loading the watermelons plaintiffs brought from their fields. SEMO procured buyers for the watermelons and ac-

---

**2.** The significance of UCC §§ 1–205(1) (course of dealing) and 2–208(1) (course of performance) is explained in Robert G. Works, Comment, *"Unless Otherwise Agreed" and Article 5: An Exercise in Freedom of Contract*, 11 St.Louis U.L.J. 416, 430 (1967):

As defined by the Code, the concepts of "course of dealing" and "course of performance" are limited literally to the conduct of

the parties prior to and under the agreement. The concept of a usage of trade is much broader; the Code's concept clearly goes beyond the merely linguistic usage, and even beyond the additive usage as it is generally conceived. [Footnotes omitted.]

**3.** § 400.1–205(3), RSMo 1986, is unchanged from the same statute in the 1969 revision.

counted for and paid plaintiffs for the watermelons that were sold.

Throughout the course of the watermelon season, SEMO paid plaintiffs partial payments. At the end of the season, SEMO settled its accounts with plaintiffs. SEMO calculated the total amount owed plaintiffs for watermelons they sold through SEMO and deducted the amounts of the partial payments throughout the season.

The disagreement that prompted plaintiffs' lawsuit against SEMO involved the price per pound that plaintiffs were to receive and whether the calculation of the amount owed was based on loaded weight in the field or delivered weight to the purchasers of the watermelons.

When considering an oral contract, ascertainment of its terms, if they are in dispute, is a fact question. *Stagner v. Staples,* 427 S.W.2d 763, 766 (Mo.App.1968). The legal effect of the terms, once ascertained, is a question of law. *Id.* Whether there exists a course of dealing between parties to a contract that discloses a course of performance that will establish or modify terms of a contract is a question of fact. *School Dist. of Springfield R–12 ex rel. Midland Paving Co. v. Transamerica Ins. Co.,* 633 S.W.2d 238, 247 (Mo.App.1982).

The trial court heard testimony that David Henderson informed Lyman Zolman that the market price for watermelons dropped a half a cent, from three cents per pound to two and one-half cents per pound. Bud Henderson testified that SEMO paid plaintiffs and "every farmer, ... through the years, on delivered weight." He testified that was the standard for the produce industry.

Bud Henderson testified that in 1992, the market fluctuated from three cents per pound for watermelons to two and one-half cents per pound; that throughout the years SEMO had done business with plaintiffs, the price of watermelons never remained constant from the beginning of the season to the end of the season. Lyman Zolman testified

that in past dealings with SEMO, he typically received a lower price for late season watermelons than for those produced early in the season. Mr. Zolman acknowledged that it was no surprise that the price of watermelons declined during the 1992 season.

Bud Henderson testified that they did not buy "futures" in watermelons. Lyman Zolman testified that he did not sell "futures" to SEMO.

"The formation of a contract does not require that all terms be settled. One or more of the terms may be left open and the agreement will not fail for indefiniteness; but the parties must intend to make a contract." *Computer Network, Ltd. v. Purcell Tire & Rubber Co.,* 747 S.W.2d 669, 674 (Mo.App. 1988). "Under the UCC, there is no requirement to detail all of the terms in order for there to be a binding agreement for the sale of goods." *Id.* at 676.

There was substantial evidence to support the trial court's determination that the parties entered into a contract for the sale of watermelons through SEMO's produce brokerage, the terms of which, considering the accepted course of performance and based on the course of dealing between the parties and usage of trade in the community in which the parties conducted business, included payment of a fluctuating price per pound of watermelon delivered.

Giving due regard to the trial court's opportunity to assess the credibility of the witnesses,[4] that determination is not against the weight of the evidence. The trial court neither erroneously declared or applied the law. Plaintiffs' point on appeal is denied. The judgment is affirmed.

SHRUM and MONTGOMERY, JJ., concur.

---

4. "An appellate court will defer to the trial court's assessment of the credibility of witnesses. *Brandt v. Brandt,* 794 S.W.2d 672, 674 (Mo.App. 1990)." *Hubbs v. Hubbs,* 870 S.W.2d 901, 909 (Mo.App.1994).