**ENVIRONMENTAL WASTE MANAGEMENT, INC.,**
Respondent,

v.

**INDUSTRIAL EXCAVATING & EQUIPMENT, INC.,**
Appellant.

No. WD 54823.

Missouri Court of Appeals,
Western District.

Oct. 6, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 1998.

Application for Transfer Denied
Jan. 19, 1999.

Richard W. Miller, Weston A. Sechtem, Miller Law Firm, Kansas City, for appellant.

Ward K. Brown, Kansas City, Thomas W. Rynard, Craft Fridkin & Rhyne, Jefferson City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and RIEDERER, JJ.

ELLIS, Presiding Judge.

Environmental Waste Management, Inc. filed suit against Industrial Excavating and Equipment, Inc. for breach of contract in Jackson County circuit court. A jury rendered a verdict in favor of Environmental Waste Management, Inc., awarding damages in the amount of $263,663.59. Industrial Excavating and Equipment, Inc. brings this appeal.

In 1992, the federal government, acting through the General Services Administration ("GSA") contracted with Rand & Co. ("Rand") to make general improvements to the Internal Revenue Service building on Bannister Road in Kansas City. During the course of the improvements, workers discovered what they thought were two underground storage tanks ("UST's") that had to be removed before completion of the project. The UST's were located under an asphalt parking lot and had been used to store oil. Workers eventually confirmed there were two 15,000 gallon tanks and one 600 gallon tank, all full of oil. Oil had leaked out of the tanks and contaminated a large amount of soil surrounding the tanks. The tanks, the oil, and the contaminated soil had to be removed from the site.

As already noted, the government's general contractor was Rand. The government also contracted with Energy Masters Corporation

("Energy Masters") to provide contract services for the project. Rand hired Industrial Excavating & Equipment, Inc. ("Industrial," defendant/appellant) as a subcontractor to provide certain labor and materials for the removal of the tanks. Industrial then contracted with Environmental Waste Management, Inc. ("EWM," plaintiff/respondent) to provide labor and materials to aid in site excavation, tank removal, soil removal, soil disposal, and the drafting of a closure report.[1] The main issues at trial revolved around what agreement, if any, Industrial and EWM reached with respect to the prices Industrial agreed to pay EWM for its services and the method used to determine the amount of contaminated soil removed from the site.[2]

Originally, Industrial contracted with EWM to aid in the removal of a different UST at the IRS building project. EWM performed its services under that contract and Industrial paid EWM based on a lump sum bid. The provisions of that contract were fully performed by both parties and are not an issue in this case. After the discovery of the UST's under the parking lot, Industrial and EWM began negotiating a second contract. EWM submitted a lump sum bid of $39,492.00 to Industrial on July 1, 1992.[3] Industrial requested EWM provide a price breakdown, detailing how it arrived at the lump sum reflected in the bid. Industrial told EWM the numbers did not have to be accurate, they just had to add up to the amount of the lump sum bid. Industrial had to submit the breakdown to Energy Masters, the government's contract representative, to substantiate its own costs. Michael Duffey, vice president of EWM, produced a document with primarily fictitious numbers, warning Industrial the numbers did not reflect EWM's actual costs. EWM worked backwards from their quote of $39,492.00, plugging in numbers that would add up to the total of the lump sum bid. As a result, the numbers did not reflect actual prices for each individual item.

Energy Masters, the government's contract representative, met with the parties in early August, 1992. Energy Masters had a problem with all the costs submitted to it by the various contractors, including the breakdown provided by EWM. Energy Masters told the parties they might have to begin work on the removal of the UST's and proceed on a PDL basis.[4] Ultimately, Industrial and EWM did not reach an agreement based on the lump sum bid EWM submitted July 1, 1992, nor the subsequent breakdown of the lump sum bid submitted on July 22. EWM never agreed to work for Industrial on a PDL basis. Industrial and Rand eventually agreed to proceed with their work on a PDL basis.

Around August 20, 1992, Industrial and EWM again entered into contract negotiations regarding the removal of the UST's. Industrial asked EWM, instead of submitting a lump sum bid, to provide a price list reflecting what it would charge per unit of work on the project. EWM provided Industrial with a letter dated August 21, 1992 which outlined the prices it would charge for certain services. The prices were set out as follows:

Labor
| | |
|---|---|
| Supervisor | $ 40.00/hour |
| Laborer | $ 30.00/hour |
| Clerical | $ 25.00/hour |

Equipment & Supplies

| | |
|---|---|
| EWM Pickup | $ 10.00/hour |
| Cleaning Chemicals | $ 40.00/gallon |
| Explosion Meter | $125.00/day |
| Pumps & Hoses | $125.00/day |
| Sampling Supplies | $ 5.00/sample |
| Tank Head Cleaner | $250.00/day |
| Poly Sheeting | $ 70.00/roll |
| Transportation | $700.00/load |
| Liquid–Disposal | $000.75/gallon |
| Hazardous Sludge Disposal | $350.00/drum |
| Laboratory Analysis/BETX & TPH Rush | $300.00/sample |

1. A closure report is required by the government when some type of environmental clean-up takes place. The Missouri Department of Natural Resources reviews the closure report and either approves the work or requires further clean-up.

2. Industrial was to pay EWM a certain amount per cubic yard of contaminated soil removed.

3. The lump sum bid did not include the cost of removal and disposal of contaminated soil, which would be billed at $32.20 per cubic yard.

4. A PDL, or price to be determined later, basis means the parties commence work on the project, keep track of their expenses, and are eventually paid based on their costs plus 10% for profit and another 10% for overhead.

A day or two after EWM sent the August 21 letter to Industrial, Ken Gray, who worked for Industrial at the time and had the power to enter into contracts on its behalf, telephoned EWM. He spoke to Michael Duffey. Gray pointed out to Duffey that the price list did not include a price for the disposal of contaminated soil. EWM's prior bid included a cost of $32.20 per cubic yard of soil removed from the site. Duffey told Gray he would still honor that quote.

Another day or two later, Gray called again and spoke to both John and Michael Duffey.[5] Gray complained that he thought the prices EWM was charging for its services were too high. John Duffey told Gray that Industrial did not have the expertise to do the job themselves, they needed EWM's experience, and the prices on the list were the amounts it would cost Industrial to hire EWM. Gray again complained about the "mark-ups" and asked whether the prices on the list included everything; meaning cost, overhead, and profit. John Duffey told him it did and that when Industrial received EWM's daily bills, these prices would be on the bills. Gray again asked EWM to provide a further breakdown of the numbers to "make them more palatable to the client" (presumably the federal government). Michael Duffey told Gray he could do whatever he wanted to with the numbers, but that the price list was what EWM would work for.

After another day or two, Gray again called and spoke only with Michael Duffey. During this conversation, Gray simply told Michael Duffey they would accept the numbers and said, "Let's go to work." Throughout the project, EWM billed Industrial on a daily basis. Each daily billing reflected the prices outlined in the August 21 letter.

The other major issue in the case revolved around the method used to determine the amount of contaminated soil removed from the site. The parties seem to agree Industrial agreed to pay EWM $32.20 for each cubic yard of contaminated soil removed from the site. EWM claims workers removed 8930 cubic yards of contaminated soil from the site, while Industrial claims only 4704 cubic yards of soil were removed. The disparity between the two numbers results from vastly different methods of measuring the amount of soil.

EWM's 8930 cubic-yard measurement reflects "swelled" yardage hauled off the site in "struck full" truck loads. "Swelled yardage" refers to the phenomenon of soil's expanding when it is removed from the ground. If one were to mark off one cubic yard of soil in the ground and dig it up, that cubic yard of soil would not fit into a box of the same dimensions. When soil is removed from the ground it expands because of the air mixed in with the soil. In the case at bar, Industrial wanted to measure the amount of soil removed from the site based on the size of the hole. Obviously this would only reflect the volume of the soil while it was still compacted in the ground. EWM wanted to measure the soil based on its size after being removed from the hole—i.e. swelled yardage.

"Struck full" loads refers to measuring the amount of soil removed based on the size of the trucks that hauled it off. Measuring based on struck full loads is a fairly common procedure in the industry. EWM and Industrial agreed to measure based on struck full loads. Therefore, EWM measured the bed of each truck before loading it up with contaminated soil the first time. Assume a truck pulls in to the lot. Workers measured the bed of the truck at ten cubic yards. The truck was given the label "A." Each time truck "A" loaded up and left the lot with contaminated soil, EWM billed Industrial for another ten cubic yards of soil. "Struck full" means the parties were to assume the trucks were leaving the lot full of soil. Even if truck A left with only six cubic yards of soil, EWM billed Industrial as if the truck were "struck full" and carrying ten cubic yards. The evidence at trial revealed Industrial not only agreed to measuring the trucks to determine the amount of soil removed from the site, but Industrial wanted EWM to bill on the struck full basis.

Industrial ascertained 4704 cubic yards of soil were removed based on measuring the

---

5. John Duffey is Michael Duffey's father and the president of EWM.

size of the hole from which the soil came. EWM never agreed to measure the amount of soil based on the size of the hole left in the ground when workers were finished digging out the contaminated dirt.

The parties agree EWM performed the work it agreed to perform and did so in a satisfactory manner. EWM's final bill to Industrial totalled $478,360.31. Industrial made payments to EWM and to some of EWM's suppliers totalling $214,696.72. On October 20, 1994, EWM filed suit against Industrial for breach of contract, seeking damages of $263,663.59. The case went to trial on May 27–30, 1997. Based on the foregoing evidence, the jury found for the plaintiff, Environmental Waste Management, Inc. and awarded it damages in the amount of $263,663.59. Industrial filed a motion for judgment notwithstanding the verdict or for a new trial, which was denied by the trial court. Industrial now brings this appeal.

Industrial claims in its first point on appeal that the trial court should have granted its motion for JNOV because EWM failed to carry its burden of proof in that it did not show any meeting of the minds between the parties as to the prices Industrial would pay EWM for its services or as to the method used to determine the amount of contaminated soil removed from the site.

As Industrial asserts error in denial of its motion for judgment notwithstanding the verdict, which presents the issue whether EWM made a submissible case, we will review the evidence in the light most favorable to EWM and we will accord EWM all reasonable beneficial inferences which can be drawn from it. *Roth v. Atchison, Topeka & Santa Fe Ry.*, 912 S.W.2d 583, 587 (Mo.App. W.D. 1995). A motion for JNOV can only be sustained if reasonable minds could not differ. *Id.*

■ For its first subpoint Industrial contends EWM failed to adduce legally sufficient evidence to prove that EWM's August 21 letter to Industrial, often referred to as EWM's price list, constituted the parties agreement because the letter, by itself, lacked many of the necessary elements of a legally enforceable contract. However, Industrial fails to recognize the theory of

EWM's case was that it had entered into an oral contract with Industrial when Ken Gray told Michael Duffey over the telephone that the numbers on the August 21 price list had been accepted and "let's go to work."

■ When considering an oral contract, ascertainment of its terms, if they are in dispute, is a question of fact for the jury. *Zolman v. SEMO Produce, Inc.*, 875 S.W.2d 605, 611 (Mo.App. S.D.1994). An oral contract may be established by a combination of testimony and documents not themselves meeting the statute of frauds. *Holtmeier v. Dayani*, 862 S.W.2d 391, 400 (Mo.App. E.D. 1993). Where a written offer is orally accepted, the result is an oral contract which embodies the terms of the written proposal. *Moore v. Kuehn*, 602 S.W.2d 713, 718 (Mo. App. E.D.1980). There is considerable support in the case law to show that phrases such as "I'll take care of it" or "[t]he roof ought to be fixed, so get on it," in response to a specific inquiry, can sufficiently demonstrate an oral contract. *Nooney Krombach Co. v. Blue Cross & Blue Shield of Missouri*, 929 S.W.2d 888, 896 (Mo.App. E.D.1996); *Moore v. Kuehn*, 602 S.W.2d at 718.

In the case at bar, the jury could reasonably have found the parties entered into an oral contract which embodied the terms of EWM's August 21 price list. John Duffey testified that he made it very clear to Ken Gray of Industrial that the prices listed in the August 21 letter reflected what it would cost Industrial to hire EWM. Michael Duffey testified that he told Gray they would also remove contaminated soil from the site for $32.20 per cubic yard. Gray admitted at trial that he believed the August 21 letter reflected EWM's price list. Finally, Michael Duffey testified that Gray told him the prices had been accepted and "let's go to work."

If the jury chose to believe Michael Duffey, it would reasonably have found the parties entered into an oral contract which incorporated the prices set out in EWM's August 21 letter to Industrial. A phrase like "let's go to work" is sufficient to support a finding that Gray had accepted the terms of the written proposal EWM submitted on the 21st. The Duffey's told In-

dustrial in no uncertain terms that they would charge the prices set out in the August 21 letter for the work Industrial needed them to do. In response to that definite statement, Ken Gray said, "Let's go to work." A reasonable juror would find Gray's statement was an oral acceptance of the proposal EWM submitted to Industrial. The evidence was sufficient to support the jury's finding that EWM and Industrial had entered into a contract whereby Industrial would pay EWM according to the prices listed in the August 21 letter and according to Duffey's verbal quote of $32.20 per cubic yard for the removal of contaminated soil.

Industrial lodges several other arguments in point I of its brief to support the notion that the evidence was not sufficient to support the jury's verdict. Industrial's second and third subpoints are somewhat related. Industrial argues that there was no meeting of the minds between the parties because all the evidence at trial revealed only that Industrial knew it was being billed based on the August 21 price list, but Industrial never agreed to pay the prices set out in the August 21 price list. Further, Industrial points to the fact that the daily billings which EWM submitted to Industrial were never signed by anyone at Industrial. Both of these points are devoid of merit.

Had Gray not told Michael Duffy the numbers had been accepted and "let's go to work," Industrial's actions alone would have bound them to the terms of the contract. Industrial's silent acquiescence in and acceptance of EWM's performance of the UST and contaminated soil removal, the prices for which were communicated through the August 21 letter and through Michael Duffey's verbal quote, constituted an implied acceptance of the contract.

> The manifestation of acceptance of an offer need not be made by the spoken or written word; it may also come through the offeree's conduct or failure to act ... "Frequently, services are rendered under circumstances such that the party benefited thereby knows the terms on which they are being offered. If he receives the benefit of the services in silence, when he had a reasonable oppor-

tunity to express his rejection of the offer, he is assenting to the terms proposed and thus accepts the offer."

*Moore v. Kuehn*, 602 S.W.2d 713, 718 (Mo. App. E.D.1980) (quoting *Corbin on Contracts*, Vol. I, 75, P. 321 (1963)). Ken Gray clearly understood the figures in the August 21 letter represented the amounts EWM wanted to charge for its services. Industrial argues this does not mean Gray or anyone else from Industrial ever agreed to pay EWM based on those prices. Likewise, Industrial contends the daily billings EWM submitted were not signed by anyone at Industrial, further evincing the fact the Industrial never agreed to pay those prices. A reasonable person would conclude that, since Gray knew EWM would bill based on the August 21 price list, EWM would expect to be paid according to that price list.

Further, every time EWM submitted a daily bill to Industrial, the prices on the daily bill reflected the same prices as the August 21 letter. Though Industrial never signed the daily bills, it continued to allow EWM to work, knowing EWM was billing based on the price list. This silent acquiescence bound Industrial to the terms of the August 21 price list. Likewise, Industrial's failure to sign the daily bills is meaningless. There was no evidence that it was customary for it to do so, and it certainly does not indicate that it was objecting to EWM doing the rest of the work based on the same prices reflected in the daily bills. *See Moore v. Kuehn*, 602 S.W.2d at 719. Therefore, even without Gray's statement to Michael Duffey that the numbers had been accepted, Industrial's actions alone were sufficient proof of a meeting of the minds between the parties with respect to the price of EWM's services.

■ Similarly, with regard to the method used to calculate the amount of soil hauled off the site, Industrial argues that it never agreed to pay EWM based on struck full loads, and the evidence at trial revealed Industrial understood EWM would bill only based on struck full loads. However, Ken Gray testified that EWM and Industrial had agreed to measure the soil based on struck full loads from the first day on which workers discovered contaminated soil at the site.

Industrial did not present any evidence that EWM ever agreed to be paid for the removal of contaminated soil based on the size of the hole in the ground after workers removed the soil. This argument is, therefore, without merit.

Industrial's next contention concerns the amount which EWM charged for disposal of contaminated liquid. After EWM offered it's lump sum bid in July (which was ultimately rejected by Industrial), Industrial asked for a breakdown of the bid so that it could substantiate its costs to the government. EWM provided a breakdown, but warned that the numbers were completely fictitious and did not reflect their actual costs. The price per gallon for disposal of contaminated liquid on the July 22 breakdown was $.50. The price per gallon on the August 21 price list was $.75. Apparently, Industrial believes that this is hard proof that there was no meeting of the minds as to price because Industrial never would have agreed to pay a price higher than the one in the July 22 lump sum bid breakdown. However, any evidence that Industrial had rejected an earlier lower priced bid would be evidence contrary to the verdict. We view the evidence in the light most favorable to the verdict. *Roth v. Atchison, Topeka & Santa Fe Ry.*, 912 S.W.2d at 587. Further, the numbers in the July 22 breakdown were not intended to reflect EWM's actual prices, rather they were merely fictitious numbers that added up to the total of the lump sum bid. Thus, the $.50 per gallon price for the removal of contaminated soil in the July 22 breakdown may not have been an accurate figure. Moreover, Industrial did not reject the $.50 per gallon price by itself; rather, Industrial rejected the entire lump sum bid.

Finally, Industrial contends that all the evidence at trial revealed that EWM agreed to proceed with the job on a PDL basis. First, any evidence of such an agreement would be contrary to the verdict. Second, we find ample evidence from both John and Michael Duffey that EWM never agreed to proceed on a PDL basis. Third, we have already found sufficient evidence in the record to support the jury's conclusion that the parties agreed to a price in advance of the commencement of work on the project. Point denied.

Industrial's second and third points concern the trial court's decision to exclude or limit certain evidence. The trial court excluded or limited evidence of the terms of the prime contract between the federal government and Rand. The trial court also limited evidence of EWM's actual costs in performing the work related to removing the UST's. Industrial argues evidence on both issues should have gone to the jury to support Industrial's position that there was no meeting of the minds with regard to price. Industrial's theory is that, given the terms of the government contract and given EWM's allegedly inflated prices (the alleged severity of the inflation revealed by studying EWM's actual costs versus the amounts they charged Industrial), Industrial never would have agreed to the prices in the August 21 letter from EWM to Industrial.

"The test for relevancy is whether the material offered tends to prove or disprove a fact in issue or corroborate other evidence." *Shop 'N Save Warehouse Foods, Inc. v. Soffer*, 918 S.W.2d 851, 863 (Mo.App. E.D.1996). The trial court has great discretion in the exclusion of evidence. *State Farm Mut. Auto. Ins. v. DeCaigney*, 927 S.W.2d 907, 910 (Mo.App. W.D.1996). "The trial court's ruling will not be disturbed on appeal unless its ruling, considering the circumstances then confronting the trial court, is either so arbitrary or unreasonable that it shocks the sense of justice or is indicative of an absence of careful consideration." *Id.* at 910–11. "Where evidence is excluded, the issue is whether the trial court abused its discretion, not whether the evidence was admissible." *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 654 (Mo.App. E.D.1997). Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action. *Id.*

Industrial's basic theory of its case revolves around the idea that all of the parties to the various contracts and subcontracts were somehow bound to operate under some of the terms of the prime government contract. Had the contract negotiations worked

flawlessly, the government would have asked Rand for a bid to remove the UST's. Rand in turn would have asked Industrial for a bid for its services, who would have then asked EWM for a bid. EWM would have submitted its bid to Industrial. Based in part on what costs it would incur in hiring EWM, Industrial would them submit its bid to Rand. Rand would then submit its bid to the government. Ideally, the government would accept Rand's bid and the parties would go to work. Rand would have a contractual relationship with the government and Industrial. Industrial would have a contractual relationship with Rand and EWM. EWM would have a contractual relationship only with Industrial.

In this case, the government thought that all of the bids were too high. The government requested a cost breakdown, which all of the three companies provided. After seeing the breakdowns, the government rejected Rand's bid and informed the parties on August 7 that they may have to proceed on a PDL basis. Eventually Industrial and Rand agreed to proceed on a PDL basis. Industrial wanted the jury to believe EWM also agreed to the PDL basis. However, testimony revealed EWM and Industrial entered into a contract in late August, after the government told the parties they might have to proceed on a PDL basis. Industrial attempted, throughout the course of the trial, to introduce evidence of the details of the government's involvement with the project. Industrial's intent was to show that since it was proceeding on a PDL basis, it never would have agreed to pay EWM the prices set out in the August 21 letter. Industrial wanted the jury to further believe EWM had agreed, along with the other parties to proceed on a PDL basis.

Because some of the evidence regarding the government contract was relevant to showing whether there was a meeting of the minds between EWM and Industrial, the trial court allowed a good deal of evidence concerning the government's involvement. For instance, the jury knew the government was the client and that its prime contractor was Rand. The jury knew Rand hired Industrial and Industrial hired EWM. At the end

of the project, the government asked each company to certify its costs so that it could make payment on a PDL basis. The jury heard evidence that EWM refused to certify its costs, and demanded payment from Industrial for the amounts due it under the terms of the August 21 price list. While the jury may not have heard evidence of the intricate details of the prime government contract, it had enough evidence before it to decide, if it believed Industrial's evidence to be accurate, that EWM had either 1) agreed to proceed on a PDL basis or 2) that Industrial never would have agreed to pay EWM based on a price list because it had agreed to payment from Rand on a PDL basis. Error in the exclusion of particular evidence is harmless if the jury had other similar evidence before it. *See Bradley v. Browning–Ferris Indus., Inc.,* 779 S.W.2d 760, 764 (Mo. App. W.D.1989). The jury had enough similar evidence before it, without delving into minute details of the government's contract and correspondence with the parties, to make a finding that EWM and Industrial did not agree that Industrial would pay EWM the prices as set out in the August 21 price list. However, the jury chose instead to find the parties did agree to the prices in the August 21 letter.

Industrial assumes that the jury would have believed, had it had all the evidence of the government contract before it, that Industrial would not have entered into a bad business deal. However, whether Industrial *would* have entered into a less than lucrative business deal is not relevant. The narrow question before the jury concerned what agreement the parties reached with regard to the August 21 price list. Evidence that the details and constraints of the government contract would have made agreeing to the August 21 prices a poor business decision is collateral. In *Brunner v. Stix, Baer & Fuller,* 352 Mo. 1225, 181 S.W.2d 643 (banc 1944), the Supreme Court addressed the appellant's argument that the trial court erred in excluding evidence that the company never enters into contracts of over $500.00 without putting the terms in writing. The Court said:

> This was offered for the sole purpose of showing that a contract of the kind in question "would not likely be entered into

by Mr. Fuller, or any other officer of the company." Here the transaction was clearly described by the witnesses, plaintiff testifying directly to the contract, and defendant's witnesses to the contrary. Even if evidence of such a rule or custom be regarded as relevant, it does not follow that its exclusion constituted reversible error, this because the admission of collateral matters tending indirectly to prove a controverted issue, is largely discretionary with the trial court.

*Id.* at 650–51.

Likewise, in the case at bar, even if additional evidence of the government contract was considered relevant, the appellant has fallen short of showing the trial court abused its discretion in refusing to admit the evidence, especially considering the fact that the trial court did allow quite a bit of evidence of the government's involvement in the process, to the extent it showed there was no meeting of the minds between the parties. Further Industrial has certainly failed to show how the admission of evidence of the governmental contract would have materially affected the merits of the action. Point two is denied.

■ Turning to Industrial's third point, we now consider whether the trial court erred in excluding evidence of EWM's actual costs. Industrial wanted the jury to hear evidence of EWM's costs to show the prices in the August 21 letter had so much profit built in and were so inflated that Industrial never would have agreed to the prices. Again, whether the deal was a good one or a bad one is not relevant. At best, it is a collateral issue, and its exclusion was within the sound discretion of the trial court. *Id.*

■ Further, since EWM was proceeding at trial only on a breach of contract theory, evidence of its actual costs were completely irrelevant. A plaintiff is entitled to submit his case to the jury on any theory of recovery he chooses, provided there is sufficient evidence to support it. *Yoos v. Jewish Hosp. of St. Louis,* 645 S.W.2d 177, 191 (Mo. App. E.D.1982). EWM's original petition was in two counts and outlined a claim for breach of contract and prayed for relief in quantum meruit. Prior to trial EWM dropped its quantum meruit count and chose to proceed only on the breach of contract count. EWM pleaded and submitted to the jury an express contract, with a fixed amount for compensation. "[W]here an express contract is pleaded and the amount of compensation fixed, evidence of reasonable value is inadmissible." *Mitchell Eng'g Co., a Div. of CECO v. Summit Realty Co.,* 647 S.W.2d 130, 143 (Mo.App. W.D.1982); *Cotton v. 71 Highway Mini–Warehouse,* 614 S.W.2d 304, 306–07 (Mo.App. W.D.1981).

Industrial attempts to distinguish the *Cotton* decision on the grounds that the court in *Cotton* made special note of the fact that the parties had agreed to a fixed price in their oral contract. The defendant in *Cotton* did not offer any evidence to contradict the terms of the contract with regard to price. However, the parties' agreement as to price was still an element the plaintiff had to prove. Industrial seems to read *Cotton* to mean the reasonable value of services is irrelevant only where the parties *stipulate* to an agreed to price for services under the contract. We disagree. *Cotton* stands for the proposition that where the plaintiff *pleads* there was an agreed to price, then the reasonable value of the services is irrelevant. What price the parties fixed may still be in dispute; nonetheless, the point is the plaintiff is proceeding on a theory that there was an agreed upon price.

In *Vic Koepke Excavating & Grading Co. v. Kodner Dev. Co.,* 571 S.W.2d 253 (Mo. banc 1978), the plaintiff alleged the defendant had agreed to pay plaintiff for labor based on an hourly rate as set out in a schedule, which schedule was set forth in the petition. *Id.* at 258. The defendant never stipulated that it agreed to pay the amounts alleged by plaintiff, and in fact, argued for a directed verdict based on the plaintiff's lack of evidence that the charges it was claiming were reasonable. *Id.* The trial court properly found that if "plaintiff were not submitting on quantum meruit it would seem there would have to be evidence as to what rates were agreed upon" *Id.* Counsel then pointed out evidence produced by the plaintiff that revealed the rates to which the parties had agreed, and the trial court overruled the

motion to dismiss. *Id.* However, the court then went on to instruct the jury that they could find for plaintiff if they believed " 'plaintiff's charges were reasonable' " *Id.* Finding this instruction was error, the Supreme Court said:

> "If the parties agreed to payment for the services according to a predetermined schedule of hourly rates, then the maximum recovery would be the agreed amount. But under instructions 4 and 5, the jury had only to find the services were furnished, that the outstanding balance was a certain amount, and that the charges were reasonable. The instruction authorized an award based upon a method of measurement different from the one agreed upon. *What charges were reasonable is not material when the charges have been agreed upon.*"

*Id.* at 259 (emphasis added).

In the case at bar, EWM pleaded that Industrial had agreed to pay them based on a schedule fixed prior to commencement of work on the project, but Industrial never admitted that it had agreed to those prices. It is not necessary that the defendants agree to the payment amounts claimed by plaintiff for costs to be irrelevant. It is only necessary that plaintiff proceed on a theory that the prices were fixed as opposed to seeking recovery in quantum meruit.

Industrial also claims that it could not put on its own defense without introducing evidence of EWM's actual costs. Industrial amended its answer to include an affirmative defense of payment. Industrial claims that in order to prove its theory of the case, i.e. EWM agreed to proceed on a PDL basis and was paid on that basis, it was necessary for the jury to know what EWM's costs were in order to compare them to the amounts Industrial had already paid. However, Industrial again fails to recognize that it was not necessary for the jury to know EWM's actual costs in order to find for Industrial. Had the jury believed EWM agreed to proceed on a PDL basis, Industrial would have won. What EWM's costs were would have been irrelevant, and the jury would not have had to go the extra step of determining whether the payments Industrial had already made were sufficient to satisfy the requirements of the PDL agreement. It was an all or nothing proposition. EWM chose to proceed with its breach of contract claim instead of proceeding in quantum meruit. As a result, its actual costs were irrelevant and the trial court did not err in excluding evidence of EWM's costs. Point denied.[6]

■■■ Industrial's last five points all pertain to alleged error in the jury instructions. Rule 70.03 provides, in pertinent part, that "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

> Where specific objections to the jury instructions were not made prior to submission of the case, the matter is not preserved for review except for plain error under Rule 84.13, which states that "plain error review affecting substantial rights may be considered by the court, though not raised or preserved, when the court finds that manifest injustice or a miscarriage of justice has resulted therefrom."

*Missouri Highway & Transp. Comm'n v. Kansas City Cold Storage, Inc.,* 948 S.W.2d 679, 682 (Mo.App. W.D.1997). We will decline to exercise our discretion to review a claim of plain error unless the claim "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted ...' " *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995).

---

6. Industrial attempts to argue this case is controlled by *City of Fulton v. Central Elec. Power,* 810 S.W.2d 349 (Mo.App. W.D.1991), which maintains that where there is no statement at all as to price, the law implies a standard of reasonableness. However, neither party proceeded on a theory that there was no statement at all as to price. According to EWM, the prices were agreed to as set out in the August 21 letter. According to Industrial, the price was to be determined on a PDL basis. The jury was not called upon to calculate the proper price if it believed the parties agreed to a PDL basis. Therefore, *City of Fulton* is not applicable, and EWM's cost were irrelevant.

In the case at bar, Industrial failed to make any objections prior to submission of the case, much less specific objections to the giving and failure to give the instructions about which it now complains. We have carefully reviewed each of Industrial's five points, and the arguments in support thereof, relating to instructional error. Instruction D, which Industrial refers to as its "affirmative converse," was properly rejected because the verdict director used did not assume as true or omit any disputed ultimate issues. *Total Econ. Athletic Mgmt. of Am. v. Pickens,* 898 S.W.2d 98, 104 (Mo.App. W.D.1995). Industrial's claim that the verdict director used was erroneous because it did not have a tail referring to Industrial's affirmative converse is devoid of merit because no affirmative converse was given. Likewise, the claim that the verdict director given was not proper because it did not set out verbatim the terms of the August 21, 1992 letter fails for the reason that the terms of the letter were unnecessary and inappropriate. " '[J]ury instructions are required to be 'simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.' " *White v. Curators of the Univ. of Missouri,* 937 S.W.2d 366, 368 (Mo.App. S.D. 1996) (quoting *Graham v. Goodman,* 850 S.W.2d 351, 354 (Mo. banc 1993). "The goal of MAI is to leave evidentiary detail to the argument of counsel and to submit only the ultimate issues for the jury's resolution by simple and concise instructions." *Id.* Industrial's assertion that the giving of Instruction 6, withdrawing the issue of EWM's costs, was erroneous is likewise without merit because, as previously discussed, EWM's costs were irrelevant. Rejection of Instruction E, focusing on an implied contract, was proper because there no evidence of an implied contract and EWM was submitting exclusively on breach of an express contract. And finally, Industrial's complaint regarding failure to give its Instruction B–1 on "meeting of the minds" is without merit because MAI 26.06, breach of a bilateral contract was used as the verdict director. *Flo–Prods. Co. v. Valley Farms Dairy Co.,* 718 S.W.2d 207, 208–09 (Mo.App. E.D.1986).

From the foregoing, it is apparent that no manifest injustice or miscarriage of justice occurred by virtue of the giving or failure to give the instructions about which Industrial complains. We therefore decline to further review Industrial's points IV through VIII.

The judgment is affirmed.

All concur.