William THORNTON, et al, Appellants,

v.

GRAY AUTOMOTIVE PARTS COMPANY, Respondent.

No. WD 58706.

Missouri Court of Appeals,
Western District.

Dec. 4, 2001.

Steven Wendell White, Independence, for Appellant.

Joseph W. Elliott, St. Joseph, for Respondent.

Before THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS, Judge, and RONALD R. HOLLIGER, Judge.

PER CURIAM.

William Thornton appeals from a judgment entered in his favor in a products liability action against Gray Automotive Parts Company ("Gray") for $450,000 but in which 95 percent of the fault was allocated to Thornton by the jury. Thornton contends: (1) that the jury verdict was inadequate; (2) that the court erred in giving a comparative fault instruction because it was not supported by the evidence and constituted a roving commission; (3) that the comparative fault instruction should not have been given because he was not a "user" of the jackstand manufactured by Gray; (4) that the trial court erred in excluding evidence of another accident involving the same type of jackstand; (5) that the court erred in excluding a 1976 internal Gray memo concerning a hypothetical new jack containing "upstop" restraints which Thornton contends would have shown Gray's knowledge of the dangerousness of the jackstand unequipped with such restraints; and (6) that the trial court erred in permitting two of Gray's witnesses to testify regarding the cause of the load loss that injured Thornton. Finding no error the judgment is affirmed.

*Factual Background*

Thornton was working as a diesel mechanic for Holmes Freight Lines, in a company vehicle maintenance shop. Thornton was tasked with assisting another mechanic, Marek Wlodek, with replacing the front end leaf springs, bushings, and pins in a Freightliner tractor. The front end leaf springs comprise part of the tractor truck's suspension, and are attached to the vehicle on spring hangers and retained by bushings and pins. The pins and bushings experience significant wear and tear, and must be periodically replaced. In order to replace those items, it was necessary to elevate the tractor.

To accomplish the task of lifting the vehicle, the shop employed a TNT–550 Truck and Trailer Airlift (hereinafter "TNT–550"), a pneumatic jack. The truck was missing its front bumper, so Wlodek positioned the jack so that its lifting saddles were placed underneath the truck's spring hangers. Wlodek then elevated the vehicle, before being joined by Thornton.

Thornton was concerned about the placement of the TNT–550, recognizing the precarious nature of that placement. He planned to fashion a bracket from angle iron to attach to the front of the vehicle to prevent the jack from shifting. Thornton approached the front of the vehicle to take measurements for that purpose. While taking those measurements, Thornton was less than an arm's length from the TNT–550. While taking his measurements, the TNT–550 apparently slipped out from beneath the tractor. The jack suddenly extended to its full length, leaping upwards and backwards several feet.

Thornton was struck near his right eye, suffering extensive injuries. Thornton underwent a series of several reconstructive facial surgeries in an attempt to treat Thornton's injuries and to repair the damage caused. At the time of trial, Thornton had incurred nearly $340,000 in medical expenses, and anticipated between $50,000 and $100,000 in future medical expenses. Thornton also lost his right eye and continues to suffer pain and numbness in his face. He has also lost his senses of smell and taste, and still possesses facial disfigurement that the reconstructive surgeries have not been able to correct.

Gray is the manufacturer of the TNT–550. The TNT–550 is equipped with auto-

matic stops at 6-inch intervals that prevent sudden downward movement of the jack. The TNT–550, however, does not have similar stops that prevent sudden upward movement of the jack. As a result, if the TNT–550 is under load and slips out from underneath that load (this is called "instantaneous load loss"), the jack can suddenly extend to its full length, and can become airborne in the process.

The TNT–550 bears several "safety tips" instructing users of safe operation of the jack:

1. This lift should be used on a level floor or surface.

2. Always lift from the center of one end of the vehicle.

3. Before raising a vehicle, release brakes, place gear selector in neutral, and chock outside of wheels at opposite end.

4. Lifting saddles should cradle lifting point. Saddle "safety stops" must hook over part of frame, bumper or bed.

5. Always engage lift's safety lock and use safety stands under frame while working on vehicle.

The "safety tips" are also accompanied by small diagrams beside each individual tip. The parties do not appear to dispute that if the "safety tips" are followed, the likelihood of an instantaneous load loss may be eliminated.

In addition to proceeding under a strict liability theory, Thornton claimed in his petition that Gray was negligent in the design of the TNT–550 and through failing to warn Thornton concerning the risk of an instantaneous load loss. First, Thornton claimed that the TNT–550 should have been equipped with "upstops" or some other mechanism to arrest or damp the sudden upward movement of the TNT–550 in an instantaneous load loss situation. One of Gray's competitors incorporated such a device in a pneumatic jack similar to the TNT–550. Second, Thornton argued that Gray should have placed a warning on the TNT–550 alerting users of the risk that the TNT–550 could suddenly extend and fly upwards in an instantaneous load loss situation. Sometime after the sale of the TNT–550 involved here, Gray began to include a warning alerting users of the dangers of instantaneous load loss.

The matter was submitted to the jury solely upon Thornton's claims of strict liability due to defective design and failure to warn. Thornton dismissed those counts of his petition regarding negligent design and negligent failure to warn.[1] Gray submitted a comparative fault instruction, asking the jury to determine whether Thornton had failed to take reasonable precautions against the reasonably apparent dangers arising from the use of the jack. At the conclusion of trial, the jury found that Thornton's damages were $450,000, but allocated 95 percent of the fault to Thornton and only 5 percent to Gray.

### Adequacy of the Verdict

Thornton, for his first point, argues that he should have been entitled to a new trial for the reason that the jury verdict of $450,000 was grossly inadequate, as it represented only his past and future medical expenses. Gray replies by arguing that the verdict is proper, because Thornton alleged only $339,310.65 in past medical expenses and there was conflicting evidence from Thornton's experts regarding his need for future medical treatment, leaving over $100,000 in general damages.

Thornton claims that the jury verdict was the direct result of jury bias or preju-

---

1. There was also a claim made by Thornton's wife for loss of consortium, but this claim was not presented to the jury and was subsequently dismissed by her.

dice. Thornton claims that the amount of the verdict is roughly equal to his past and projected future medical expenses. Thornton contends that the verdict should also have properly included amounts intended to compensate him for his pain and suffering, disfigurement, and loss of enjoyment of life. Gray replies by arguing that Thornton did not present substantial evidence that future medical expenses would be incurred. Thus, under Gray's argument, the jury's verdict includes approximately $110,000 in general damages (for pain and suffering, etc.) after deducting $339,310.95 from the verdict for Thornton's past medical expenses.

At trial, Thornton's treating physician, Jeffrey Collyer, indicated that it was "reasonably certain" that Thornton would require additional surgeries to remove the remaining portion of the injured eye. Dr. Collyer indicated that if another surgery became necessary, it would cost between $25,000 and $100,000, depending on complications and whether additional reconstructive work to the underlying bone structure was required.

■ We may reverse a trial court's denial of a motion for new trial premised upon inadequacy of the verdict only when that denial was an abuse of discretion. *See Wright v. Long*, 954 S.W.2d 470, 472 (Mo.App.1997). This standard is highly deferential to the trial judge and jury, as they are uniquely situated to assess the credibility of witness testimony and other evidence in determining damages. *See id.* Indeed, when "the verdict reached by the jury has the approval of the trial court, its discretion is practically conclusive." *Id.* We are limited to a determination of whether substantial evidence exists to support the jury's verdict. *Id.* To reverse, we must find that the verdict is "so shocking and grossly inadequate that it could have

only resulted from passion and prejudice on the part of the jury." *Id.*

■ Viewing the evidence in the light most favorable to the verdict, it does not appear that Thornton's argument can prevail, as substantial evidence supports the jury's verdict. From Dr. Colyer's testimony, the jury could have easily concluded that any future surgery would not cost as much as the $100,000 upper limit suggested by Thornton. Instead, the doctor's testimony reveals that a future surgery, if required, could cost as little as $25,000. That testimony also indicated that the likelihood of another surgery was not certain. So, the jury might also have found that future surgeries were unnecessary. Most likely, the $110,000 (approximately) awarded to Thornton after deduction of past medical expenses, was comprised of both an award for future medical damages and one for general damages such as pain and suffering.

Thornton fails to make a persuasive argument that the verdict is not supported by substantial evidence. Nor is his argument persuasive that the verdict is so "woefully inadequate" that it should shock the conscience of this court. On the contrary, the evidence supports the jury's verdict and suggests that the jury properly considered all categories of damages in arriving at that verdict. The first point on appeal is denied.

### Instructional Error

Thornton's next point on appeal alleges instructional error, specifically that the trial court erred by submitting this comparative fault instruction (Instruction No. 7):

In your verdict, you must assess a percentage of fault to Plaintiff William Thornton, whether or not Defendant was partly at fault, if you believe:

First, either:

Plaintiff placed his face right above the jack saddle when he knew the jack was in danger of slipping; or

Plaintiff failed to determine whether the safety tips had been followed before approaching the jack; and

Second, Plaintiff William Thornton thereby failed to undertake the precautions a reasonably careful user of the jack would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances, and

Third, such conduct directly caused or directly contributed to cause Plaintiff William Thornton's injuries.

Thornton alleges that the evidence did not support either disjunctive option in the first paragraph. Thornton also argues that the instruction gave the jury a roving commission, as it asked the jury to determine whether all of the "safety tips" had been followed.

Gray replies, arguing that there was sufficient evidence adduced at trial to support the admissibility of the instruction. Further, Gray argues that Thornton's "roving commission" claim was waived due to failure to raise that objection during the instruction conference.

Although Thornton contends that the evidence supported neither disjunctive submission in the first paragraph of the instruction, his discussion is directed primarily at the second disjunctive submission, which asked the jury to consider whether Thornton had failed to determine whether the "safety tips" for use of the jack had been followed. He argues that he either had no duty to do so, or alternatively that he *had* discharged that duty by determining that at least one of the safety tips had *not* been followed by his coworker, Wlodek. That determination, Thornton con-

tends, led directly to his attempt to remedy the potentially unstable situation, just before the accident occurred. Gray replies, arguing that there was sufficient evidence for the jury to make a determination that Thornton had failed to observe the "safety tips."

■ Thornton also contends that this portion of the instruction constituted a roving commission to the jury. Gray responds, claiming that the instruction did not give a roving commission to the jury. A jury instruction constitutes a roving commission when "an instruction assumes a disputed fact or submits an abstract legal question that allows the jury 'to roam freely through the evidence and choose any facts which suited its fancy or its perception of logic' to impose liability." *Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 463 (Mo. banc 1998).

■ While not raised by Gray, the arguments raised in this point on appeal appear to suffer from a fatal defect, as they have not been properly preserved for appeal. At the instruction conference, Thornton's sole objection to Instruction No. 7 was that a submission of comparative fault in a products liability case is limited to the grounds articulated under § 537.765, RSMo.[2] In his objection, Thornton stated only that his actions could not fall within the boundaries of § 537.765 because the evidence did not support the proposition that he was a "user" of the jack. This argument appears to concern Thornton's next point on appeal, which will be discussed more thoroughly below. At no point in the transcript does it appear that Thornton raised the specific issues of whether the instruction incorrectly submitted the question of whether Thornton had followed the "safety tips" or that the ver-

---

**2.** All statutory references are to RSMo 2000, unless otherwise indicated.

dict director constituted a roving commission.

■ A party cannot raise one objection to an instruction at an instruction conference, then raise a different argument on appeal. *McKersie v. Barnes Hosp.*, 912 S.W.2d 562, 567 (Mo.App.1995). As this point has not been properly preserved for appeal, this point on appeal is denied.

### Was Thornton a "User" of the Jack?

For his third point on appeal (and his second attack upon Instruction No. 7), Thornton raises the issue of whether he was a "user" of the jack. This is the objection that Thornton raised in his objection at the instruction conference, thus this point is properly preserved for review.

Thornton argues that he was never a "user" of the jack, as he did not set up the jack nor did he attempt to begin repairs on the elevated vehicle. He contends that paragraph second of Instruction No. 7 parallels § 537.765.3(5), which limits comparative fault to "users" of a defective product. Thornton claims that after Wlodek had set up the jack and elevated the truck, he had just approached the vehicle to begin taking measurements for fashioning a retaining bracket for the jack when load loss occurred. Thornton testified that he did not touch the jack or the truck when taking those measurements. Under these circumstances, Thornton argues that the "user" of the jack was not him, but instead his coworker, Mark Wlodek. Thus, Thornton concludes, if the evidence did not support the proposition that he was a "user" of the jack, submission of the comparative fault instruction was improper and misleading to the jury.

■ In reviewing a claim of instructional error, in order to reverse the judgment below, we must find that the instruction read to the jury misled, misdirected, or somehow confused the jury, resulting in prejudice to Thornton. *Choate v. Natvig*, 952 S.W.2d 730, 734 (Mo.App.1997). To evaluate the submissibility of a jury instruction, we must view the evidence in the light most favorable to the party submitting the instruction. *Van Volkenburgh v. McBride*, 2 S.W.3d 814, 821 (Mo.App. 1999). As suggested by Thornton, paragraph second of Instruction No. 7 essentially parallels § 537.765.3(5). Section 537.765.3, RSMo, limits the application of comparative fault in product liability cases and frequently employs the term "use" and "user." Specifically, the statute provides that comparative fault in product liability cases is limited to:

(1) The failure to use the product as reasonably anticipated by the manufacturer;

(2) Use of the product for a purpose not intended by the manufacturer;

(3) Use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to said danger;

(4) Unreasonable failure to appreciate the danger involved in use of the product or the consequences thereof and the unreasonable exposure to said danger;

(5) The failure to undertake the precautions a reasonably careful user of the product would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances; or

(6) The failure to mitigate damages.

Section 537.765.3, RSMo. Presumably, if the injured party's actions do not fall into any of these categories, then comparative fault cannot be invoked by the defendant.

The essence of Thornton's argument is that because of the frequent references to "use" or a "user" of the product, one can

only apply comparative fault principles under § 537.765.3 if one is a "user" of the defective product. Thornton, as indicated above, takes the position that he was not "using" the jack. Lacking any evidence that he was a "user" of the jack, Thornton claims that Instruction No. 7 was not properly submitted to the jury. Gray, in response, argues that as Thornton was an active participant in the repair procedure in which the jack was employed, he was a "user" of the jack, like his coworker, Wlodek. Further, Gray contends that part of "using" the jack is securing the load, which was what Thornton was attempting to do at the time of the load loss.

Thornton's argument has a threshold appeal, since the placement of the jack and raising of the truck was conducted by Wlodek. Clearly, Wlodek's actions set up the unstable situation that ultimately resulted in Thornton's injuries. During those actions, Thornton was not a "user" of the jack. The question, then, is whether Thornton, by approaching the vehicle to take measurements for the construction of a retaining bracket, became a "user" of the jack.

 The more persuasive answer to this question would appear to be that Thornton's active involvement in attempting to further secure the jack made him enough of a "user" of the jack to bring him within the ambit of § 537.765.3. Thornton appears to characterize his involvement as almost that of a bystander. This is not consistent with his testimony that he was assisting Wlodek in the maintenance procedure. Under the facts of this case it was for the jury to determine whether Thornton was a "user" of the product. Thornton's third point on appeal is denied.

*Evidence of a Similar Accident*

For his fourth point on appeal, Thornton claims the trial court erred by excluding the testimony of James Boswell, another individual injured in an accident similar to that which befell Thornton.

 A trial court has considerable discretion in determining whether evidence should be admitted or excluded. *Envtl. Waste Mgmt., Inc. v. Indus. Excavating & Equip., Inc.*, 981 S.W.2d 607, 613 (Mo.App. 1998). We may reverse the trial court only when the exclusion of evidence abused its discretion by being so arbitrary or unreasonable that it "shocks the sense of justice or is indicative or an absence of careful consideration." *Id.* (quoting *State Farm Mut. Auto. Ins. v. DeCaigney*, 927 S.W.2d 907, 910 (Mo.App.1996)). Even if that threshold is met, however, we will not reverse unless the error resulted in a material effect upon the merits of the action. *Id.*

 In products liability cases, evidence of an accident similar in nature to that which injured the plaintiff is admissible provided the evidence is relevant and sufficiently similar to the injury-causing incident so as to outweigh the concerns of undue prejudice and confusion of the issues. *See Newman v. Ford*, 975 S.W.2d 147, 151 (Mo. banc 1998). To be similar, each occurrence must be (1) of like character, (2) occur under substantially the same circumstances, and (3) result from the same cause. *Gerow v. Mitch Crawford Holiday Motors*, 987 S.W.2d 359, 364–65 (Mo.App.1999). The two occurrences do not need to be completely symmetrical, however. *Pierce v. Platte-Clay Coop., Inc.*, 769 S.W.2d 769, 774 (Mo. banc 1989).

During trial, Thornton made an offer of proof regarding the testimony that Boswell would have offered, had he been permitted to testify. The offer of proof was conducted by questioning Boswell outside the hearing of the jury concerning the incident in which he was injured. As with the case

at bar, Boswell was injured by a TNT–550 jack that was being used to elevate a tractor-trailer truck. Boswell had previously approached the front of the vehicle, and was between 1.5 and 2.5 feet from the jack. The last thing Boswell could recollect before awaking in the hospital was that he had just turned away from the jack. He did not see whether there was a "load loss" or whether the jack had jumped. Boswell stated that he had been told by others in the area that the jack had jumped, and later saw marks above a doorway roughly 6 feet away that he was told were made by the jack. Nevertheless, Boswell does not have an independent recollection of how the accident occurred.

The trial court was initially inclined to permit Boswell's testimony. After further argument by the parties and the formal offer of proof, however, the trial court held Thornton needed to establish four elements to show the admissibility of Boswell's testimony: (1) that the same model of jack was involved; (2) that the jack was being used to lift a truck or other heavy object; (3) a load loss; and (4) that the jack "jumped" and injured someone in the process. Thornton argues that these criteria are more restrictive than those articulated in *Gerow*. Gray, however, has the stronger argument that the court's criteria are merely the specific application of the *Gerow* criteria to the specific type of accident at issue in this case.

Applying these criteria, the trial court found that the offer of proof failed to establish that there was a load loss, that the jack had jumped, or how Boswell was injured. The trial court observed that because of Boswell's limited recollection, it was impossible to determine "whether or not the jack jumped, whether or not the jack came straight out toward him and hit him as it came out laterally, or whether the jack went in the air and fell on him.

...." Based upon the gaps in Boswell's testimony and his lack of first-hand recollection, the trial court determined that the similarity of the two occurrences could not be properly established.

■ Thornton appears to recognize the extent to which Boswell's awareness of the mechanics of his injury stems from comments made by others. As Gray argues, any statement that the jack had shifted out from under the load or had jumped would have been hearsay, since Boswell had no independent recollection of those events. Hearsay, of course is inadmissible, unless it falls within a recognized exception. *State v. Shaw*, 14 S.W.3d 77, 81 (Mo.App.1999). Thornton does not argue that the testimony falls within any exception to the general rule barring hearsay testimony. Nevertheless, he contends that Boswell should have been permitted to testify before the jury regarding his accident, suggesting that Gray would have had adequate opportunity to cross-examine Boswell concerning the limits of his independent recollection of the accident. Thornton posits that such an approach would bring the facts of the occurrence before the jury without having to bring in several witnesses to retry that other event.

■ The arguments raised by Thornton lack merit. Clearly, the court would have erred in permitting Boswell to testify before the jury as to what he was told by others regarding the accident. Similarly, the trial court properly discounted the hearsay components of Boswell's testimony in determining whether the two accidents were sufficiently similar. Absent admissible evidence regarding how the jack came out from under the truck and how Boswell's injury occurred, the similarity of the Boswell accident to the case at bar could not be properly established. Simply put, the only *admissible* propositions to which Boswell could testify would

be (1) that he had approached a TNT–550 jack that had been used to elevate a tractor trailer truck, and (2) he had apparently been injured by the jack.

This testimony would not meet the threshold requirements for admission of the Boswell accident under *Newman* or *Gerow, supra.* Thornton did not tender any other evidence or testimony concerning the mechanics of Boswell's accident, arguing that he should not be required to retry another case to get the facts of the Boswell accident admitted. Thornton's concern bears merit, as the more witnesses required to testify regarding some other occurrence would seem to increase the danger of confusion of the issues. Despite this concern, however, it is difficult to find fault with Gray's contention that Thornton should have presented the testimony of at least *one* witness to the accident who could describe how the jack came out from under the vehicle and whether it "jumped." This lack of such other evidence is critical, since Thornton's claim is premised upon the lack of safety devices preventing sudden extension of the jack in a load loss situation, causing the jack to "jump." Lacking such evidence, we hold that the trial court did not abuse its discretion in excluding Boswell's testimony. Thornton's fourth point on appeal is denied.

### The 1976 Memo

In his fifth point, Thornton claims that the trial court abused its discretion in excluding from evidence an internal Gray memo, written in 1976, describing a proposed trade-in plan for the TNT–550, in which it would be traded for a newer model equipped with an "upstop restraint." This "upstop restraint" was intended to arrest sudden extension of the jack in an instantaneous load loss situation. Thornton claims that the memo shows that Gray recognized that there was a need for some

sort of restraining mechanism on the TNT–550. He further contends that the memorandum supports his claim that the jack was defective without such a mechanism. Gray responds that the memo was prepared in anticipation of a restraint mechanism being developed, but that a satisfactory restraint mechanism that would have been effective and reliable over the lifetime of the jack was never developed.

As with the prior point, the standard of review regarding evidentiary rulings provides that reversal of the judgment below can occur only if the trial court abused its discretion in excluding otherwise admissible evidence and the appealing party was prejudiced by that exclusion. *Envtl. Waste Mgmt., Inc.*, 981 S.W.2d at 613. Unfortunately, Thornton does not rely upon any authority in support of his arguments, beyond a citation to a single case setting forth the applicable standard of review. We, therefore, have no assistance weighing the merit of his arguments.

To determine whether the trial court improperly excluded the evidence, we first ask whether the evidence was relevant and material to Thornton's claim. Thornton claims that the trade-in memo is relevant and material because it "reveals Gray's knowledge of the necessity of an upstop, the feasibility of an upstop, and tends to prove the existence of a defect in the jack without the upstop." Gray replies, admitting that it had explored possible upstop mechanisms. While Gray essentially admits the potential utility of such a restraint mechanism, Gray contends that none of the options explored was sufficiently reliable to use as a safety device.

Ultimately, the issue of whether Gray knew about upstops or the need to implement such a device on the TNT–550 is irrelevant, however. The claim that Thornton submitted to the jury regarding

the lack of an upstop was couched in terms of a strict liability design defect theory, not under Thornton's alternative negligent design theory. In strict liability cases, the prior or subsequent knowledge of the manufacturer regarding a design defect is immaterial. *Keller v. Int'l Harvester Corp.*, 648 S.W.2d 584, 587–88 (Mo.App.1983). Liability is instead premised upon proof that the defect exists, that the defect renders the product unreasonably dangerous, that the product was used by the plaintiff in a manner reasonably anticipated by the manufacturer, and that the plaintiff's injuries resulted from the defect. *See* M.A.I. 25.04 (5th Ed.1996).

Thornton also claims, however, that the memo is probative because it goes to establish the existence of such a design defect. The parties refer us to no reported Missouri case discussing the specific question of what types of evidence are relevant to proving a design defect. Some guidance is provided, however, by *Hoppe v. Midwest Conveyor Co., Inc.*, 485 F.2d 1196 (8th Cir.1973). In *Hoppe*, the Eighth Circuit, outlined several categories of evidence that are probative on the issue:

> The comparative design with similar and competitive machinery in the field, alternate designs and post accident modification of the machine, the frequency or infrequency of use of the same product with or without mishap, and the relative cost and feasibility in adopting other design are all relevant to proof of defective design.

*Id.* at 1202 (footnotes omitted). While this list does not appear to be exclusive, it does reveal the nature and tenor of the evidence that is relevant to the issue posed by Thornton.

The trade-in memo does not specifically contain information concerning any of the categories outlined by *Hoppe*. Instead, all it discusses is a trade-in program for a newer version of the TNT–550 that touts several improvements to the product. The substance of the document appears to be a discussion of how the company could utilize a trade-in program for the older jacks as a means to increase sales of the newer jack. It does not discuss the cost or feasibility of the new design, or make any statements that could be interpreted as a claim that the old design was defective or flawed. Further, as the testimony at trial indicates, production was never started on the new jack and a suitably reliable upstop mechanism was never developed. Thus, the trade-in program suggested by the memo was never implemented by Gray.

Reviewing the trade-in memo as a whole, it does not appear that the trial court abused its discretion in excluding the document from evidence. At best, the memorandum suggests a general intent by Gray to produce a new version of the TNT–550 with several new features, including a hypothesized upstop mechanism. It does not, however, suggest that the previously produced version of the jack was in any way defective. As such, the document has limited relevance to the issues at bar, and the trial court acted within its discretion in excluding the evidence. Thornton's fifth point on appeal is denied.

*Admission of Gray's Expert Testimony*

For his last point on appeal, Thornton argues that the trial court abused its discretion in permitting the testimony of two of Gray's witnesses, Kendal Blank and Dr. Franklin Appl. These individuals offered testimony regarding the cause of the load loss, the proper manner of changing pins in spring hangers, the manner in which the TNT–550 was set, and how the TNT–550 was not the proper jack for the job. Thornton contends this evidence was irrelevant because there was no dispute that the load loss was caused due to the im-

proper placement of the jack by Wlodek. While his argument is not entirely clear, Thornton appears to take the position that he had no duty to make sure that the truck was properly secured when he approached the vehicle.

Gray responds, arguing that accepting Thornton's argument would deny it the opportunity to challenge one of the elements of Thornton's claim. While not identifying the specific element, Gray appears to contend that the testimony of these witnesses was relevant to whether the jack was being put to a "reasonably anticipated use." *See* M.A.I. 25.04 (5th Ed.1996). Gray also argues that the evidence was admissible on the issue of Thornton's comparative fault. Gray states that the evidence was offered to show "the potential dangers of load loss occurring and the steps taken to prevent it such as using jack stands." Without such testimony, Gray suggests that would not have been able to show what procedures and measures Thornton should have followed to ensure his own safety when assisting Wlodek.

 In attempting to explain his position, Thornton suggests that his theory of liability is related to the "enhanced injury" doctrine that has developed in the automotive context. This doctrine, sometimes referred to as the "second collision" doctrine, distinguishes between the conduct or circumstances which cause an accident and an alleged design defect which causes an injury to the plaintiff. *See Gerow v. Mitch Crawford Holiday Motors,* 987 S.W.2d 359, 362 (Mo.App.1999). It extends liability to a manufacturer in those circumstances where the defect causes "separate or enhanced" injuries to the plaintiff. *Id.* If the plaintiff's use (or misuse) of the product sets the injury-causing sequence in motion, and that use was reasonably foreseeable by the manufacturer,

then the doctrine holds that the plaintiff's conduct is not relevant. *Id.* at 362–63. Under the correct circumstances, the manufacturer cannot even raise the misconduct of the plaintiff as a basis for comparative fault. *See id.* at 363. Looking to this doctrine, Thornton contends that the particular placement of the TNT–550 in elevating the truck, even if improper, was reasonably foreseeable by Gray. So long as Gray could have reasonably foreseen that improper placement and the resulting load loss, Thornton suggests, his conduct in approaching the jack is irrelevant.

Gray, in return, suggests that the enhanced injury doctrine has only been applied in Missouri to products liability actions arising out of vehicular accidents, and should not be extended beyond that context. Gray also attempts to distinguish the cases upon which Thornton relies, by characterizing them as involving two distinct injury-causing events, such as the initial collision, and a fuel fire caused by a punctured fuel tank (or the impact of the plaintiff's head with the windshield in an automobile collision due to a defective seat belt). Gray says that Thornton's accident is different, as there was only one injury-causing event: the jack slipping out from underneath the truck and striking Thornton.

Thornton's argument has some persuasive value, as the substantial nature of his damages resulted, in major part, from the violent extension of the TNT–550, due to the lack of any restraint mechanism. An argument could even be made that the jack's jumping was a second injury-causing event beyond the jack's slipping from underneath the load, thus addressing at least part of Gray's argument.

 However, Thornton did not properly preserve his argument. Neither party discusses the preservation question, but the transcript reveals that Thornton

did not raise the "enhanced injury" doctrine during trial, nor did he allude to it within his objections during the testimony of Blank and Appl. It is well settled that if a party fails to raise an objection concerning an issue at trial, that issue is not preserved for appeal. *See Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 357 (Mo.App.1998).

Early in Blank's testimony, the following bench conference occurred:

MR. WHITE: In the interest of being consistent, I object, because this is now getting into the proper manner to change springs and bushings. Talking about something entirely different in this case, because when Bill Thornton entered the picture, the truck was already up. They had not attempted and were not attempting to change the springs and bushings. They hadn't gotten to the point of jack stands yet. It is irrelevant, red herring and misleading to the jury. I object.

THE COURT: Overruled.

MR. WHITE: One other thing. I would like the record to be clear. If I could have a continuing objection to the technique and manner in which change bushings and spring hangers and all that, it is irrelevant.

MR. SANDBERG: That is fine. I mean the whole subject is covered.

THE COURT: All right.

There were other substantive objections interposed by Thornton during Blank's testimony, but these were limited to objections to certain photos Gray sought to admit during Blank's testimony. There was no other substantive objection to the content of Blank's testimony. Similarly, there was no overall objection to the testimony of Dr. Appl. There were a couple of instances where Thornton objected to certain photographs or diagrams showing a similar placement of a TNT–550 in relation to an elevated truck, mainly with regard to the rotation of the two jack saddles in relation to the spring hangers.

Thornton raised this evidentiary issue in a motion in limine prior to trial. Specifically, the motion sought to exclude evidence or other testimony offered by Gray regarding the cause of the load loss, the manner in which the jack was set up, the claim that the jack was incorrect for the task, or alternate methods of changing the pins in spring hangers. The motion also specifically invoked the "enhanced injury" doctrine. The trial court denied Thornton's motion. As a motion in limine, however, Thornton's motion, alone, preserves nothing for appellate review. *See State v. Dowell,* 25 S.W.3d 594, 601 (Mo.App.2000). Instead, he was required to raise specific objections to the evidence at trial to preserve the issue for review. *State v. Johns,* 34 S.W.3d 93, 112 (Mo. banc 2000).

Simply put, given Thornton's failure to raise specific objections on this issue during the testimony of Blank and Appl, we refuse to address the merits of Thornton's arguments regarding this point on appeal. Even assuming that admission of the testimony was erroneous, we are not of the opinion that the parties' rights have been affected by the admission of this testimony "so substantially that a miscarriage of justice or manifest injustice would occur if the error were left uncorrected." *Peterson,* 972 S.W.2d at 357. Thus, we decline to review this point for plain error. Point denied.

Having found no reversible error in the proceedings below, the judgment is hereby affirmed.