Kevin **KNIFONG**, Respondent,

v.

**CATERPILLAR, INC.**, Appellant.

No. WD 65393.

Missouri Court of Appeals, Western District.

Sept. 5, 2006.

Grant L. Davis, Scott S. Bethune,
Randall W. Brown, Margaret E. Dean, and

Timothy L. Brake, Kansas City, MO, for respondent.

Steven P. Sanders, Lisa A. Larkin and Heather L. Langlois, St. Louis, MO, for appellant.

Before EDWIN H. SMITH, C.J., and SPINDEN and HARDWICK, JJ.

EDWIN H. SMITH, Chief Judge.

Caterpillar, Inc., appeals from the judgment of the Circuit Court of Jackson County, for the respondent, Kevin Knifong, on his products liability claim for damages for personal injuries he sustained from an explosion. The respondent, a mechanic, was seriously injured when the battery of the Caterpillar front-end loader, on which he was working as an employee of LaFarge Construction Company, exploded. The respondent brought suit against the appellant alleging, *inter alia*, that the explosion occurred as a direct result of a defect in the design of the battery of the front-end loader. Specifically, he alleged that the design of the battery safety vent cap system was defective in that it failed to properly vent the explosive gases that normally exist around batteries, which exploded from sparks from the battery terminal posts. Prior to trial, all the named defendants, except the appellant, settled with the respondent.

The appellant raises five points on appeal. However, because we conclude that the discussion of Points I–IV have no precedential value, we affirm as to those points, in accordance with **Rule 84.16(b)**, and are furnishing the parties a written memorandum of the reasons for our affirmance.

In Point V, the appellant claims that the trial court erred in denying its motion for a new trial for an excessive verdict or in the alternative for remittitur, pursuant to § 537.068, remitting the respondent's compensatory damages award of $2,500,000, because the record clearly establishes that the award was grossly disproportionate to the respondent's economic damages that were proven at trial, $14,530.31, such that it far exceeds the fair and reasonable compensation to which the respondent was entitled, by law, for his injuries caused by the battery explosion.

We affirm.

## Facts

On October 30, 1996, the respondent was the senior mechanic in charge of routine maintenance and equipment repair at LaFarge Construction Company in Blue Springs, Missouri. The company supplied ready-made concrete. As part of its operations, LaFarge used Caterpillar front-end loaders, powered by Caterpillar batteries, to move sand, gravel, and other materials into bins so they could be mixed into concrete.

On October 30, 1996, at 6 a.m., Wendell Bradsher, an employee at LaFarge, attempted to use one of the front-end loaders, but it would not start. He went to the mechanics' room to report the problem to the respondent. The respondent investigated, including performing a visual inspection of the battery, but could not identify any problems. He removed one of the battery's safety vent caps to check the fluid levels. The fluid levels were sufficient, so he replaced the cap. The respondent then used a tester/charger to test the battery, which revealed that it was fully charged, at which point he disconnected the battery tester cables from the battery. Within a few seconds, the battery exploded. When the explosion occurred, the respondent was standing over the battery, taking the brunt of the explosion in the face. He was struck by fragments of the battery and splashed with battery acid.

Brian McDonough, an employee of La-Farge, was standing close to the respondent when the battery exploded, and he helped the respondent to the ground so Larry Jennings, another employee, could flush his eyes out with eyewash. The respondent was eventually taken by ambulance to Saint Mary's Hospital in Blue Springs where he was treated for severe chemical burns and lacerations, mostly concentrated around the right eye. As a result of the accident, the respondent is legally blind in his right eye, having only 20/400 vision.

On May 26, 1999, the respondent and his wife, Melanie, filed suit against the appellant in the Circuit Court of Jackson County for damages they alleged were caused by the battery explosion.[1] On June 1, 2001, they filed their third-amended petition, alleging five counts, the first four counts dealing with the respondent's damages for personal injuries, and Count V asserting a loss of consortium claim on behalf of the respondent's wife. The respondent alleged in Count I, negligent design, assembly, and manufacture of the battery; in Count II, products liability for defective design of the battery; in Count III, products liability for defective manufacturing of the battery; and in Count IV, products liability for failure to warn. Named as defendants in Counts I, IV, and V were the appellant, which designed, manufactured, and sold the front-end loader; Dean Machinery Company, which was the Caterpillar dealer that sold the front-end loader to the appellant's employer; Tulip Corporation, which designed and manufactured the casing of the battery of the front-end loader; and VB Autobatterie, which designed and manufactured the battery core. As to Counts II and III, the same defendants were named, except not Dean Machinery.

During discovery, the appellant propounded interrogatories to the respondent, requiring him, pursuant to **Rule 56.01(b)(4)(a)**, to identify any expert witnesses he expected to call at trial and to state the general nature of the subject matter on which each expert would testify. In his response to the interrogatories, the respondent identified Dr. Jeffrey Ketchman, his treating physicians, and his health care providers, as retained expert witnesses, who he intended to call at trial. He later supplemented his answers to interrogatories, identifying Gary Bakken as an additional retained expert he intended to call at trial. No other experts were identified. However, Tulip, a co-defendant, pursuant to interrogatories propounded to it by the appellant, identified Bernard Spiegelberg as an expert it intended to call at trial.

On October 3, 2003, Tulip deposed Spiegelberg as its corporate representative, and on June 6, 2004, deposed him as an expert in battery designs. The appellant was present at both depositions and each time cross-examined him. At the June 6, 2004, deposition, Spiegelberg testified, *inter alia*, that the battery design was defective because of insufficient spacing in the safety vent cap between the vent hole and flame arrester. On October 12, 2004, counsel for the respondent sent a letter to counsel for the appellant, advising that although the respondent considered Spiegelberg to be a non-retained expert and no interrogatory had been propounded to him regarding identifying such experts, he wanted to notify the appellant that he intended to offer Spiegelberg's deposition at trial.

All of the named defendants, except the appellant, settled with the respondent prior to trial. In addition, Counts I and III–

---

1. The record on appeal does not contain a copy of that petition.

V were voluntarily dismissed, and the appellant proceeded to trial on Count II only, his products liability claim for defective design as to the safety vent cap system of the battery in question. On November 5, 2004, the respondent's case against the appellant proceeded to a jury trial.

At trial, the respondent, in his case-in-chief, offered portions of Spiegelberg's expert deposition testimony. The appellant objected on numerous bases including that Spiegelberg was not properly identified as a retained witness, it was not given notice of Spiegelberg's testimony, Spiegelberg lacked the proper qualifications to testify as an expert in battery designs, Spiegelberg's methodology was flawed, and Spiegelberg did not state his opinions within a reasonable degree of certainty. Over these objections, the trial court admitted Spiegelberg's testimony. The appellant offered the videotaped deposition of Marc Galland, a Caterpillar engineer, and the videotaped deposition of Ward Reeser, a retired Caterpillar project engineer who worked in battery production development. The appellant was seeking to introduce their testimony to establish the fact that the battery in question had passed numerous safety tests before it was sold and it met industrial standards. The respondent objected on the basis that whether the battery passed certain tests or met certain standards was irrelevant in a products liability case for defective design. The trial court sustained the objection. The appellant also offered portions of the videotaped deposition of Jean–Pierre Moreau, the sales manager for VB Autobatterie, in which he testified that the battery in question had passed certain safety tests and that he had never heard of any other battery explosions. The respondent ob-

jected on the basis that it was repetitious of the testimony of appellant's witness, John Votoupal, a Caterpillar representative. The trial court sustained the objection.

The jury returned a verdict finding the appellant 90% at fault and the respondent 10% at fault, and assessing the respondent's compensatory damages in the amount of $2,500,000. Pursuant to § 537.060, the trial court reduced the amount of damages by $87,500, the amount of proceeds received from the defendants who settled before trial, leaving damages of $2,412,500. The court then reduced this amount by 10%, or $241,250, to account for the respondent's partial fault, leaving damages of $2,171,250, on which it awarded pre-trial interest of $1,180,505.70, resulting in a judgment for the respondent of $3,351,755.60.[2]

On January 1, 2005, the appellant filed a motion for a judgment notwithstanding the verdict or in the alternative for a new trial. The appellant also filed a motion for a remittitur and/or to vacate, modify, set aside, correct, reopen, or amend the judgment. On April 5, 2005, the trial court denied both motions.

This appeal follows.

## Remittitur

The appellant claims that the trial court erred in denying its motion for remittitur, pursuant to § 537.068, remitting the respondent's compensatory damages award of $2,500,000, because the record clearly establishes that the award was grossly disproportionate to the respondent's economic damages that were proven at trial, $14,530.31, such that it far exceeds the fair and reasonable compensation to which the

**2.** Although the judgment indicates the amount is $3,351,755.60, the proper math would indicate it is $3,351,755.70.

respondent was entitled, by law, for his injuries caused by the battery explosion. We disagree.

■■■ "Excessive verdicts generally arise in two situations: (1) when the jury makes an honest mistake in weighing the evidence as to the nature and extent of the injury and awarding disproportionate damages; and (2) when the jury is biased by trial misconduct to award grossly excessive damages." *McCormack v. Capital Elec. Constr. Co.*, 159 S.W.3d 387, 394–95 (Mo. App.2004). In the first instance, remittitur is appropriate without re-trial, while in the second instance, a new trial is appropriate. *Id.* at 395. The rationale for this dichotomy has been stated thusly:

> [W]here the jury errs by awarding a verdict which is simply too bounteous under the evidence, injustice may be prevented by ordering a remittitur. A new trial is not required because the jury is not guilty of misconduct, only an honest mistake as to the nature and extent of the injuries.

*Lindquist v. Scott Radiological Group, Inc.*, 168 S.W.3d 635, 647 (Mo.App.2005) (*quoting Larabee v. Washington*, 793 S.W.2d 357, 360 (Mo.App.1990)). To be entitled to a new trial, based on a grossly excessive verdict for damages, actual trial error must be shown. *Barnett v. La Societe Anonyme Turbomeca Fr.*, 963 S.W.2d 639, 657 (Mo.App.1997). The party challenging the verdict as being excessive must show that the verdict, viewed in a light most favorable to the plaintiff, "was glaringly unwarranted and that some trial error or misconduct of the prevailing party was responsible for prejudicing the jury." *Id.* Hence, the size of the verdict alone will not establish the requisite bias, passion, and prejudice of the jury sufficient to order a new trial for an excessive verdict. *Id.*

Here, the appellant makes no claim with respect to any trial error that caused the jury to be prejudiced and biased resulting in a grossly excessive verdict necessitating a new trial. Rather, it is claiming that the error in and of itself was the excessive verdict, requiring remittitur. Specifically, it is claiming that because the award of non-economic damages was far in excess of the economic damages awarded, it should have been remitted by the trial court as being excessive. Because the appellant makes no claim or argument that the trial court erred in not ordering a new trial based on an excessive verdict, we need only decide whether the court erred in denying the appellant's motion to remit, in accordance with § 537.068.

■■■ The assessment of damages is primarily a function for the jury. *McCormack*, 159 S.W.3d at 395. However, under § 537.068, the trial court may enter a remittitur order if, "after reviewing the evidence in support of the jury's verdict, the court finds that the jury verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." *Lavin v. Carroll*, 871 S.W.2d 465, 467 (Mo. App.1994). On appeal, we review the trial court's denial of a motion or application for remittitur for an abuse of discretion. *Id.* An abuse of discretion occurs when a verdict is so excessive as to shock the conscience of the appellate court. *McCormack*, 159 S.W.3d at 395. "The appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and only when the verdict is manifestly unjust." *Id.* In our review to determine whether the trial court erred in failing to remit a jury's verdict for damages, we are to view the evidence in a light most favorable to the verdict. *Id.*

It is well settled that there is no precise formula for determining whether a verdict is excessive. *Id.* "Each case must be considered on its own facts, with the ultimate test being what amount fairly and reasonably compensates the injured party." *Id.* Courts typically evaluate the reasonableness of compensatory awards based on the following factors: (1) loss of present and future income; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards approved in comparable cases; and (7) the trial court's and jury's superior opportunity to evaluate plaintiff's injuries and other damage. *Id.* In addition, a "judgment may be based in part on 'certain intangibles' that do not lend themselves to precise calculation, such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 250 (Mo. *banc* 2001) (citation omitted).

As noted, *supra*, the jury returned a verdict for the respondent assessing compensatory damages of $2,500,000, and finding the appellant 90% at fault and the respondent 10% at fault. In accordance with § 537.060,[3] the trial court first reduced the award by $87,500, the total amount of the proceeds received from the defendants who settled with the respondent before trial, leaving damages of $2,412,500. The trial court then reduced the award by 10%, or $241,250, the percentage of respondent's fault, leaving damages of $2,171,250. The trial court awarded the respondent pre-trial interest in the amount of $1,180,505.70, which resulted in a final award of $3,351,755.60.

The respondent does not dispute the appellant's contention that, based on the record, of the $2,500,000 damages assessed by the jury, only $14,530.30 was for economic damages such that its verdict included $2,485,469.70 in non-economic damages. Hence, in that context, the economic portion of the damages assessed would represent less than one percent of the total. Given this ratio of economic damages to non-economic damages, the appellant claims that the trial court erred in failing to remit the jury's assessment of compensatory damages, citing our decisions in *Barnett*, 963 S.W.2d at 656; *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 175 (Mo.App.1997); and *McCormack*, 159 S.W.3d 387 (Mo.App.2004), for the proposition that as a matter of law, when the non-economic damages far exceed the economic damages, the assessment does not constitute fair and reasonable compensation for the plaintiff's injuries, requiring remittitur, in accordance with § 537.068. We disagree.

In *Barnett*, a wrongful death case, the jury returned a verdict for the plaintiffs, assessing compensatory damages of $175,000,000 and punitive damages of $175,000,000. 963 S.W.2d at 644. Both the compensatory and punitive damages were remitted by the trial court to

---

3. **Section 537.060** reads, in pertinent part: "Defendants in a judgment founded on an action for the redress of a private wrong shall be subject to contribution, and all other consequences of such judgment, in the same manner and to the same extent as defendants in a judgment in an action founded on contract. When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater. The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor."

$25,000,000 and $87,500,000, respectively. *Id.* The purely economic damages were determined to be $649,080, *id.* at 645, resulting in non-economic damages, after remittitur, of $24,350,920, *id.* at 658. On appeal, this court found that an award of $25,000,000 in compensatory damages was excessive and remitted the amount to $3,500,000. *Id.* at 669. However, while the *Barnett* court did remit the plaintiffs' compensatory damage award, it did not establish a rule mandating that compensatory damage awards must be remitted where the non-economic damages far exceed the economic damages. Rather, it is clear that its remittitur was based upon its consideration of the law concerning the permissible measure of damages in wrongful death cases, the seven reasonableness factors in determining compensatory damages discussed *supra,* and the particular merits of the individual case. In that regard, the court stated: "There is no exact formula to determine whether a verdict for compensatory damages is excessive and, of course, each case must be considered on its own merits." *Id.* at 657. Thus, we fail to see how *Barnett* supports the appellant's contention that as a rule or as a matter of law, compensatory damage awards must be remitted when the non-economic damages far exceed the economic damages.

In *Letz,* a companion wrongful death case to *Barnett,* the jury returned a verdict for the plaintiffs, assessing lump sum damages of $70,000,000, without differentiating as to compensatory and punitive damages. 975 S.W.2d at 175–76. On appeal, this court determined that based on the applicable law, its review of compensatory damages in wrongful death cases over the last ten years, and the record, the jury could not have awarded more than $2,500,000 in compensatory damages, meaning that of the $70,000,000 lump sum award, $67,500,000 was for punitive dam-

ages. *Id.* at 177. The court then found that the *punitive* damage award was excessive and remitted it to $26,500,000. *Id.* at 180. The compensatory damage award was left intact. Hence, *Letz* did not address the issue presented here, whether a compensatory damage award must be remitted where the jury's assessment of non-economic damages far exceeds its assessment of economic damages.

In *McCormack,* the jury returned a verdict for the plaintiffs on their negligence claim, assessing compensatory damages of $30,400,000. 159 S.W.3d at 393. The trial court found the $30,400,000 to be excessive and remitted the award to $8,900,000, of which $1,400,000 was for economic damages, leaving $6,300,000 in non-economic damages. *Id.* at 398. The plaintiffs consented to the remittitur as a condition to the denial of the defendant's request for a new trial. *Id.* at 394. However, the defendant appealed. *Id.* As such, pursuant to **Rule 78.10,** the plaintiffs cross-appealed, claiming that the amount of remittitur was excessive. *Id.* On appeal, the defendant claimed that the trial court erred in not granting it a new trial due to an excessive verdict, *id.* at 398, and on their cross-appeal, the plaintiffs claimed, in pertinent part, that the trial court erred in granting remittitur because in calculating its remitted award, the court "improperly applied a 'standard of uniformity' in comparing the jury's verdict with judgments in other cases" and denied them their constitutional right to have the jury determine damages, *id.* at 399.

On appeal, the defendant claimed, *inter alia,* that the jury's verdict was excessive and was engendered by the "inflammatory misconduct of plaintiff's counsel." *Id.* at 398. This court, deferring to the trial court as being in a superior position to judge the defendant's motion for a new trial for an excessive verdict, rejected that

claim, finding that the defendant had "failed to show that the misconduct resulted in manifest injustice." *Id.* The court also rejected the plaintiffs' claim on cross-appeal that the trial court erred in remitting the jury's verdict of compensatory damages because in doing so, it improperly applied a "standard of uniformity" and deprived them of their right to a jury trial by its arbitrary use of a mathematical formula or multiplier to determine damages on remittitur. *Id.* at 399. The court, although recognizing that uniformity had been rejected as a *sole basis* for a remittitur, recognized that it was a factor to be considered in determining the reasonableness of a damage verdict. *Id.* However, the court made it clear that it was only one factor to consider. *Id.*

In rejecting the plaintiffs' claim, this court found that the trial court, in remitting the award "did not apply a 'standard of uniformity' or mathematical formula as the sole basis for the reduced award." *Id.* at 400. Rather, "[t]he court properly considered the nature and extent of the injuries, the actual economic loss, the amount actually requested for Mrs. McCormack, and the extent to which the remitted award was within the range of similar cases." *Id.* Ultimately, the court concluded:

> None of the evidence persuades us that remittitur of the $30.4 million verdict was manifestly unjust. There is no dispute that Mr. McCormack's actual economic loss was in the range of $1.4 million to $1.7 million. The remitted negligence award of $7.7 million included the actual loss and five-fold multiplier for pain, suffering, and other intangible losses. By contrast, the jury's award was at least seventeen times Mr. McCormack's economic loss and clearly exceeded the range of awards deemed reasonable in similar cases.

*Id.* at 401. From this, we glean that the *McCormack* court was recognizing that there is no bright-line rule that non-economic damages cannot exceed economic damages by any certain multiplier or that damages are to be determined by an arbitrary mathematical formula. Rather, the *McCormack* court made it clear that the trial court is in the best position to determine whether the evidence supports the jury's assessment of damages as being fair and reasonable compensation, which would include the weight to be given the range of awards deemed reasonable in similar cases, and that in the absence of an abuse of discretion, an appellate court must defer to its judgment with respect to the issue of remittitur. *Id.*

■ We find no support in the cases cited that compensatory damage awards must be remitted where the non-economic damages "far exceed" the economic damages. Rather, our reading of the cases only reinforces the proposition that each case must be considered on its own facts, with the ultimate test being what amount fairly and reasonably compensates the injured party, given the record. *Alcorn,* 50 S.W.3d at 250. To apply solely a multiplier or comparative approach in determining damages as a matter of course in every case, could, in a given set of circumstances, violate the mandate that once liability is established, the plaintiff is entitled to fair and reasonable compensation for his damages. For instance, if a plaintiff's economic losses were extremely small, such as $1,000, for example, arbitrarily applying a multiplier of five without any consideration for the particular merits of the case would result in non-economic damages being limited to $5,000 even though the plaintiff's injuries were severe, resulting in disfigurement, pain and suffering, etc.

Here, the respondent concedes that his economic losses totaled $14,530.30, consist-

ing of $7,100.61 in medical expenses and $7,429.70 in lost wages.[4] However, he contends that the non-economic damages assessed by the jury were justified by the record, when viewed in a light most favorable to the jury's verdict. We agree.

As discussed *supra*, in determining the reasonableness of a verdict, courts generally look to seven factors: (1) loss of present and future income; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards approved in comparable cases; and (7) the trial court's and jury's superior opportunity to evaluate plaintiff's injuries and other damage. *McCormack*, 159 S.W.3d at 395. In addition, a "judgment may be based in part on 'certain intangibles' that do not lend themselves to precise calculation such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Alcorn*, 50 S.W.3d at 250 (citation omitted). In that regard, the record reflects that the appellant had lost income of $7,100.61, medical expenses of $7,429.70, and was 37 at the time of the accident. As to injuries, the record reflects that the accident caused severe chemical burns and lacerations around his right eye. There is permanent scarring around his right eye. There was severe trauma from the blunt force of the injury, resulting in the respondent having 20/400 vision and being legally blind in his right eye. He experienced problems with depth perception, dizziness, headaches, and double-vision. The headaches were painful enough to wake him up from sleep. As a result of his injuries, he is unable to participate in many of his favorite activities, including playing basketball, going hunting, welding, or participating in horse shows. He is unable to read and has trouble watching television and driving, es-

pecially at night. Additionally, he has trouble being in crowds because his equilibrium is off, causing him to run into people. He is at risk of developing glaucoma and pthisis bulbi, or loss of the total eye. Due to the accident, the respondent also suffers from an exotropia, or wandering eye, which has already required one surgery and will likely require future surgeries. In addition to physical problems, the respondent has also suffered psychological and social problems. He is embarrassed by his appearance and believes that people are always staring at him. Consequently, he has trouble socializing with people and, thus, he has withdrawn from his family and friends. He constantly avoids activities he enjoys because he is afraid that he will not be able to do them.

As to awards approved in comparable cases, the appellant cites us to *Thornton v. Gray Auto. Parts Co.*, 62 S.W.3d 575 (Mo. App.2001). There, the plaintiff was awarded $450,000 in a products liability action and appealed the award as being grossly inadequate. *Id.* at 578. As in our case, the plaintiff there was working as a mechanic and was injured by a pneumatic jack when it struck him near his right eye, causing extensive injuries. *Id.* He had to undergo a series of several reconstructive facial surgeries. He incurred nearly $340,000 in medical expenses, and he anticipated between $50,000 and $100,000 in future medical expenses. He also lost his right eye and suffered pain and numbness in his face. He also lost his senses of smell and taste and was disfigured. *Id.* The appellant contends that in using *Thornton* as a comparable case, the trial court, here, was compelled to remit the jury's damage assessment.

In considering the plaintiff's claim on appeal, the *Thornton* court stated:

---

4. Here we note that the mathematical calculation is off by one cent.

"[W]hen the verdict reached by the jury has the approval of the trial court, its discretion is practically conclusive. We are limited to a determination of whether substantial evidence exists to support the jury's verdict." *Id.* at 580 (citations omitted). In light of this standard, it is not surprising that the *Thornton* court declined to overturn the jury's verdict of $450,000, which was approved by the trial court. *Id.* at 580. In approving the verdict, it simply found that the plaintiff had "fail[ed] to make a persuasive argument that the verdict is not supported by substantial evidence." *Id.* In doing so, the court did not determine that a higher verdict would not have been within the range of damages supported by the record. The court was not asked that question. It was only presented with the question of whether the $450,000 award was within that range. We have no way of knowing whether the $450,000 was within the lower or upper end of the permissible range, as determined by the record. In our case, the shoe is on the other foot. Here, the defendant is asking us to determine whether the $2,500,000 awarded the plaintiff is within the range of damages. We believe it is.

From its superior vantage point, the trial court declined to remit the jury's compensatory damage award in that it determined that the jury's verdict was supported by the record as being fair and reasonable compensation for the respondent's injuries caused by the battery explosion. Given the record, we cannot say that the trial court abused its discretion in refusing to remit the jury's award. As such, we bow to the jury and the trial court, as we should.

Point denied.

### Conclusion

The judgment of the Circuit Court of Jackson County for the respondent, Kevin Knifong, and against the appellant, Caterpillar, Inc., on the respondent's products liability claim for damages for personal injuries, is affirmed.

SPINDEN and HARDWICK, JJ., concur.