Virgil A. McCORMACK and Sandra McCormack, Appellant–Respondents,

v.

CAPITAL ELECTRIC CONSTRUCTION COMPANY, INC., Respondent–Appellant.

Nos. WD 62975, WD 62976, WD 63004.

Missouri Court of Appeals, Western District.

Dec. 21, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 1, 2005.

Application for Transfer Denied April 26, 2005.

Edward D. Robertson, Jr., Jefferson City, MO, Grant L. Davis, Kansas City, MO, for Appellant–Respondent.

Patrick Lysaught, Kansas City, MO, for Respondent–Appellant.

Before: SPINDEN, P.J., HOLLIGER and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

This appeal arises from a jury verdict awarding Virgil and Sandra McCormack $30.4 million dollars on negligence and loss of consortium claims against Capital Electric Construction Company, Inc. The McCormacks accepted remittitur of the verdict to $8.9 million and now appeal the trial court's denial of prejudgment interest. Capital appeals the denial of its motion for new trial. In a cross-appeal, the McCormacks challenge the remittitur.

We reverse the denial of prejudgment interest on Mr. McCormack's damage award and affirm on the remaining points.

I. FACTUAL AND PROCEDURAL HISTORY

Virgil McCormack suffered an electrical shock and was seriously injured on December 13, 1995, while working as a carpenter on a construction project at the Marion Merrell Dow offices in Kansas City. The shock occurred when he came into contact with an uncapped 277–volt live electrical wire as he stood on a metal scaffold taking drywall measurements. Mr. McCormack had few immediate symptoms from the electrical shock, other than fatigue and initial confusion. Two weeks later, he began having seizures and his symptoms eventually progressed to pain in his chest, hips and shoulders, migraines, impaired concentration, numbness, loss of motor control, and problems with his balance and gait.

In September 1998, Mr. McCormack filed a negligence claim against Capital, the electrical subcontractor on the construction project. His wife filed a claim for loss of consortium. At trial, the jury found Mr. McCormack was 92% at fault for the electrical shock incident and awarded him damages of $256,000. The jury found against Mrs. McCormack on her loss of consortium claim.

The McCormacks filed a motion for new trial, asserting the verdict was against the weight of the evidence. The trial court granted the motion, and the new trial was affirmed on appeal. *McCormack v. Capital Elec. Constr. Co.*, 35 S.W.3d 410 (Mo. App.2000).

A second jury trial was held in February 2003. The jury returned a verdict for the

McCormacks, assessing 100% fault against Capital. Compensatory damages of $28.8 million were awarded on Mr. McCormack's negligence claim and $1.6 million for Mrs. McCormack's loss of consortium. The court's judgment included an award of prejudgment interest.

Capital filed a motion for new trial or, alternatively, for remittitur and sought to amend the judgment to disallow prejudgment interest. After extensive briefing by the parties, the court determined the total verdict was excessive and ordered a new trial unless the McCormacks agreed to a remittitur of the negligence award to $7.7 million and the loss of consortium award to $1.2 million. The court also amended the judgment to deny prejudgment interest.

The McCormacks agreed to the remittitur and appealed the denial of prejudgment interest. Capital filed a separate appeal of the denial of the new trial motion, and the McCormacks cross-appealed the remittitur pursuant to Rule 78.10 [1]. After consolidating the appeals, this court transferred the case to the Supreme Court in light of a constitutional challenge to the remittitur statute, as raised by the McCormacks. The Supreme Court granted Capital's motion for remand and retransferred the consolidated case to this court for full determination.

## II. Issues on Appeal

### A. Remittitur

Both parties raise several issues challenging the remittitur of the jury's $30.4 million compensatory damages verdict to $8.9 million. Capital contends a new trial, rather than remittitur, was required because plaintiff's counsel presented improper evidence and closing arguments that prejudiced the jury to render an excessive verdict. Capital further argues that Rule 78.02 [2] is unconstitutional and should not preclude this court from ordering a new trial. The McCormacks argue the remittitur was improper because: (1) the trial court applied the wrong standard of uniformity; (2) the jury's verdict was not excessive or against the weight of the evidence; and (3) the trial court's application of the remittitur statute violated their constitutional right to a jury trial.

### 1. Applicable Law

■■■ Section 537.068 [3] allows a court to order remittitur upon a finding that the jury's verdict is excessive because it "exceeds fair and reasonable compensation for plaintiff's injuries and damages." One of the purposes of the doctrine of remittitur is to promote judicial economy by avoiding the delay and additional expense of a new trial. *Ince v. Money's Bldg. & Dev., Inc.*, 135 S.W.3d 475, 479 (Mo.App.2004). Thus, when the amount of damages is the sole error, an appellate court should offer the plaintiff the option of accepting judgment for the proper sum and avoid further litigation. *Id.*

■■■ Excessive verdicts generally arise in two situations: (1) when the jury

---

1. All rule citations are to the Missouri Rules of Civil Procedure (2004) unless otherwise noted.

 Rule 78.10 provides: "Consenting to a remittitur as a condition to the denial of a new trial does not preclude the consenting party from asserting on appeal that the amount of the verdict was proper or that the amount of remittitur is excessive. A party consenting to a remittitur may not initiate the appeal on that ground but may raise the same on the other party's appeal."

2. Rule 78.02 provides: "Only one new trial shall be allowed on the ground that the verdict is against the weight of the evidence."

3. All statutory citations are to the Revised Statutes of Missouri 2000, unless otherwise noted.

makes an honest mistake in weighing the evidence as to the nature and extent of the injury and awarding disproportionate damages; and (2) when the jury is biased by trial misconduct to award grossly excessive damages. *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 655 (Mo.App.1997); *Ince,* 135 S.W.3d at 478. A disproportionate verdict resulting from the jury's honest mistake can be corrected by remittitur and does not require a retrial. *Barnett,* 963 S.W.2d at 655. An excessive verdict engendered by misconduct and jury bias is prejudiced and can only be remedied with a new trial. *Id.*

■ The assessment of damages is primarily a function for the jury. *Messina v. Prather,* 42 S.W.3d 753, 760 (Mo.App. 2001). The trial court's reduction of the award by remittitur constitutes a discretionary ruling on the evidence. *Fust v. Francois,* 913 S.W.2d 38, 49 (Mo.App. 1995). An abuse of discretion occurs when a verdict or remitted judgment is so grossly excessive as to shock the conscience of the appellate court. *Id.; Alcorn v. Union Pacific R.R. Co.,* 50 S.W.3d 226, 249 (Mo. banc 2001). The appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and only when the verdict is manifestly unjust. *Alcorn,* 50 S.W.3d at 249–50.

■ There is no precise formula for determining whether a verdict is excessive, but courts typically evaluate the reasonableness of compensatory damages based on the following factors: (1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damage. *Messina,* 42 S.W.3d at 760–61.

Compensatory damages may also be based on intangibles that cannot be easily calculated, such as past and future pain, suffering, effect on lifestyle, and embarrassment. *Alcorn,* 50 S.W.3d at 250. In considering these factors on appeal, we view the evidence in a light most favorable to the judgment and disregard all unfavorable evidence. *Ince,* 135 S.W.3d at 479. Each case must be considered on its own facts, with the ultimate test being what amount fairly and reasonably compensates the injured party. *Id.*

2. TRIAL COURT PROCEEDING

Viewed in a light most favorable to the judgment, the evidence at the second jury trial was as follows. At the time of the electrical shock incident in December 1995, Mr. McCormack was a healthy, 39–year old carpenter who had enjoyed fishing and spending time with his family. He suffered only fatigue and confusion immediately following the shock but, within two weeks, began to experience seizure-like "spells." The spells worsened to a point where he had at least two grand-mal seizures, causing a loss of control over his bladder and bowels. He developed chronic pain in his chest, hips, and shoulders, as well as migraine headaches, impaired concentration, and confusion. He walked with a cane due to problems with his balance and gait. He complained of facial numbness, loss of motor control, and difficulty thinking of words. With regard to Mr. McCormack's condition in the months and years after the shock incident, his friends and family described him as mentally and physically "very slow" and "in a fog."

Mr. McCormack presented testimony from eleven medical providers concerning his seven-year history of treatment for the injuries resulting from the electrical shock. Experts concluded that he suffered "diffuse brain damage" that left him with a cognitive deficit and substantially de-

creased his I.Q. Test results confirmed that he had memory loss, impaired concentration and verbal fluency, and psychomotor retardation. The electrical injury produced a permanent chemical change in his brain that caused depression, dementia, and rendered him sexually dysfunctional. He was unable to drive due to prescribed medications necessary to control his seizures.

Mr. McCormack's physicians and experts testified that he is permanently disabled and unemployable as a result of his mental and physical injuries. They agreed his condition will likely worsen over time because the symptoms of electrical injuries are often delayed and progressive. An economist testified that if Mr. McCormack had not been injured, he would have had lifetime earnings of approximately $1.4 million based on his life expectancy and average yearly income as a carpenter prior to the electrical shock incident.

Capital sought to rebut the compensatory damages claim with a malingerer defense, asserting that Mr. McCormack was exaggerating or faking his injuries for monetary gain. Defense experts attributed many of his symptoms to complications of his diabetes and other conditions unrelated to the electrical shock. They testified Mr. McCormack did not have a seizure disorder and that his grand mal seizures resulted from a toxic dosage of the anti-seizure medication. After comparing his high school aptitude test results with the post-incident I.Q. tests, the experts found no difference in Mr. McCormack's cognitive abilities. Two experts suggested that Mr. McCormack had researched information on electrical shock injuries and then "acquired" them as part of a "learned injury" syndrome. Nearly all of the defense experts expressed disbelief that the plaintiff could possibly have all of his claimed symptoms.

During closing arguments, plaintiffs' counsel requested the jury to award $29.65 million in total damages. Counsel argued Mr. McCormack was entitled to $1.4 million for income loss and $27 million for pain and suffering, while Mrs. McCormack should receive $1.25 million for loss of consortium. After explaining the damages request, plaintiffs' counsel made the following arguments regarding the malingerer defense:

> This number I'm suggesting to you. If they come in here one more time—if they stand up one more time and say he is a malingerer, I think you should double it. Because every time they say that to his family, they are hurting them.

> \* \* \* \*

> There is one [thing] you can do in this case, which is you can be an independent body who has looked at all this evidence, and you can say loud and clear that what they have done, this defense, this frivolous, hurtful defense is wrong, and that Virgil and Sandy haven't done anything to bring this into their lives....

Capital did not object to these statements made during closing arguments.

After the jury rendered a verdict awarding Mr. McCormack $28.8 million and Mrs. McCormack $1.6 million, Capital filed a motion for new trial or, alternatively, for remittitur of the damages to no more than $256,000, the amount of the verdict in the first trial. Capital contended, *inter alia,* that plaintiffs' counsel's closing argument improperly invited the jury to punish the defendant, thereby prejudicing the jury to render a "grossly excessive verdict."

The trial court agreed that the verdict was excessive in light of the evidence indicating that Mr. McCormack had $1.4 million in lost earning capacity as a result of his injuries. There was no evidence pre-

sented at trial regarding Mr. McCormack's past or future medical costs.[4] The court also agreed that plaintiffs' counsel's closing argument was, at times, improper but disagreed that the jury was prejudiced by it. The court concluded that Capital's emphasis on the malingerer defense and the lack of credible testimony from defense experts evoked a strong adverse reaction from the jury. The trial judge gave the following detailed explanation:

> ... I think this is a very dangerous defense. I think a jury, when you see a working class guy who comes up there, and if you sit there and you challenge his integrity and his family's integrity by the nature of your defense, you're playing with fire ... It worked very well in the first case, but I think, to [an] objective mind, it's a very dangerous defense. And I think clearly it had a major impact on this case.

> I think also, again, the lay testimony ... was virtually unimpeached about these seizures, what they saw, it's just so inconsistent with that [malingerer] defense. I think that was certainly a factor.

> I think some of the expert testimony—in complete candor—the Defendant put forth was ... difficult to fathom. And I think reasonable people would just find it not particularly believable and offensive.

> I think particularly the testimony of Dr. Hughes and Dr. Rubenstein were just somewhat off the charts. Dr. Hughes writes down that Mr. McCormack is a malingerer when he doesn't even see him ... And Dr. Rubenstein cites a treatise and doesn't even understand the treatise is written by a bunch of lawyers.

> And I think some of these experts, the two that I said in particular ... I think it's unavoidable to say that this testimony was match on a fire or match on gasoline. It really affected the verdict. ...

> With that being said, I do not believe that the closing argument or the conduct of the Plaintiff's attorneys was outcome determinative of this verdict. Although there are arguments that legitimately cause concern and ... were objectionable and ... should not have been made, I don't think it affected the outcome of this verdict. ... I don't think it had an effect on the fact that the jury would likely award a large sum of money based on the evidence that was heard and the testimony and the defense that was used.

The court concluded a new trial was not *required* because the jury was not prejudiced by the improper argument of plaintiff's counsel. The trial court also found that Capital waived any allegation of jury prejudice by failing to object to the closing argument at trial. The court explained, "the failure to object was done because of trial strategy and that certainly is a major factor in me overruling any new trial motion relative to the issues of the closing argument or the issues that the posture of the case by Plaintiff was to punish and not to compensate."

The trial court determined that remittitur of the excessive verdict was proper because the jury mistakenly evaluated the damages in an emotional response to Capital's malingerer defense. The plaintiffs were given the option of accepting remitti-

---

4. Mr. McCormack had received a workers' compensation award to cover most, if not all, of his past and future medical expenses. Evidence was presented regarding past medical treatment and likely future medical treatment, but no dollar figure was presented to the jury for those costs.

tur of Mr. McCormack's award to $7.7 million and Mrs. McCormack's award to $1.2 million, or a new trial. The court explained that Mr. McCormack's reduced award was based on his $1.4 million in lost earnings multiplied by a factor of five and then another half of that added (i.e. $700,000) due to the size of the jury's verdict. After reviewing comparable remittitur cases, the court determined the five-fold multiplier was on the "high end" but had been "frequently approved" as reasonable. The court further explained that Mrs. McCormack's award was reduced because the jury's award of $1.6 million exceeded her counsel's request for $1.25 million during closing argument. The McCormacks accepted the remittitur in lieu of a new trial, reducing the total judgment to $8.9 million.

### 3. CAPITAL'S POINTS ON REMITTITUR

In its first two points, Capital contends the trial court erred in denying the motion for new trial because the excessive verdict was engendered by jury bias resulting from the inflammatory misconduct of plaintiff's counsel. Capital argues remittitur was improper because plaintiff's counsel: (1) incited the jury, during closing argument, to punish the defendant when punitive damages were not at issue; (2) sought sympathy by crying in front of jurors and asking them to "imagine" stepping into the plaintiffs' shoes; (3) unfairly argued that the defendant suborned perjury by paying an expert to give a particular opinion.

■■■ In light of Capital's failure to object to the alleged misconduct during closing argument, the trial court was limited to considering the motion for new trial under the plain error standard of Rule 78.08. *Giddens v. Kansas City S. Ry. Co.*, 937 S.W.2d 300, 306 (Mo.App.1996). The rule allows discretionary review of plain errors affecting substantial rights if the court finds a manifest injustice or miscarriage of justice has resulted. *Id.* Such review is best accomplished by the trial judge, who is in a far better position than the appeals court to fairly determine the effects of unobjected argument or evidence on the jury's verdict. *Id.* The trial court has no duty to grant a new trial unless the effect of the misconduct was so prejudicial that a party did not receive a fair trial. *Id.*

■■■ Here, the trial court made an express finding that the jury's award of $30.4 million in damages did not result from improper argument by plaintiffs' counsel. Upon careful consideration of the evidence, the court ruled the excessive verdict was the product of Capital's malingerer defense and the lack of credible witnesses to support its claim that Mr. McCormack was faking his injuries. The detailed findings support the court's conclusion that the jury was more likely offended by Capital's "dangerous defense" than influenced by plaintiffs' counsel's improper suggestion to punish the defendant by doubling the $29.65 million in damages requested. The record also reflects the jury disregarded the request for double damages and awarded only $750,000 more than the McCormacks requested in closing arguments.

■■■ We must defer to the trial court's discretion in reviewing the misconduct of plaintiffs' counsel under the plain error standard. *Id.* at 307. The court did not abuse its discretion in denying the motion for new trial because Capital failed to show that the misconduct resulted in manifest injustice. Accordingly, Points I and II are denied.

In Point III, Capital contends it was entitled to a new trial because the court erroneously admitted medical evidence regarding Mr. McCormack's brain scans

without a proper foundation. Capital asserts the positive emission tomography (PET) scans were inadmissible, pursuant to Section 490.065, as an unreliable method of diagnosing electric shock injuries. Capital further argues the improperly admitted evidence prejudiced the jury to award excessive damages.

■ Prior to trial, the court denied Capital's motion to exclude all evidence relating to the PET scans. When the PET scans were offered into evidence at trial, Capital responded that it had "no objection." This response constituted a waiver of any claim of error regarding admissibility of the evidence. *State v. Yole*, 136 S.W.3d 175, 180 (Mo.App.2004).

■ As opposed to a simple failure to object, which may warrant plain error review, a statement by defense counsel that there is no objection to a particular piece of evidence precludes a finding that the failure to object was negligent or inadvertent and resulted in manifest injustice. *Id.* "Where a party affirmatively states that he has no objection to the introduction of evidence at trial, plain error review is unavailable." *Id.*

By expressly waiving any objection to the PET scan evidence at trial, Capital also waived any error arising from the admission of the evidence. To hold otherwise would place the trial court in a precarious position. *Id.* As we recognized in *Yole*, the court should not be faulted for reasonably relying upon counsel's affirmative representations:

> Counsel appropriately resents judicial interference in their appropriate representation of a client during trial. Counsel makes many tactical decisions at trial, and the court is not privy to the mental process in determining the tactical approach employed by counsel. Thus, when counsel affirmatively repre-

sents to the court the waiver of any objection to the introduction of evidence, the court can assume that counsel's decision is reasoned and calculated and that counsel does not want the court to preclude introduction of the evidence....

*Id.*

The trial court properly refused to grant a new trial based on the PET scan evidence because Capital waived any error by stating it had "no objection." Point III is denied. In light of our determination that Capital has failed to show any grounds requiring a new trial, we need not address the argument in Point IV, that Rule 78.02 can not preclude a new trial because the rule is unconstitutional.

4. McCORMACKS' POINTS ON REMITTITUR

The McCormacks contend the trial court erred in granting remittitur because it improperly applied a "standard of uniformity" in comparing the jury's verdict with judgments in other cases. In a related argument, they contend their constitutional right to a jury trial was violated by the court's "arbitrary" use of a mathematical formula or multiplier to determine damages on remittitur.

■ Citing *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. banc 1978), the McCormacks correctly point out that the rule of uniformity has been expressly rejected as the sole basis for a remittitur. However, *Graeff* also recognizes that uniformity is one of the elements the trial court can properly consider in determining the reasonableness of a verdict. *Id.* at n. 26. More recently, in *Gomez v. Construction Design, Inc.*, 126 S.W.3d 366, 375–76 (Mo. banc 2004), the Supreme Court confirmed that "a comparison of the compensation awarded in cases of comparable injury" can be made as one of several factors in considering the propriety of remittitur.

We have reviewed the trial court's detailed explanation of the grounds for granting remittitur, as reflected in forty-three pages of the transcript from the post-trial proceedings. It is clear the court evaluated the jury's verdict based on the nature and extent of Mr. McCormack's injuries, his diminished earning capacity, and the impact of his injuries upon his wife. The court made specific findings that Mr. McCormack "suffered a brain injury from this electrical event and that it has caused severe and residual and continuing problems that will affect him probably the rest of his life." The court acknowledged there was no evidence of medical expenses, and that Mr. McCormack's economic loss was approximately $1.4 million, based on the testimony of an expert witness. With regard to Mrs. McCormack's loss of consortium, the court found:

> I think that Mrs. McCormack suffered real damages, and I think there was compelling evidence that she suffered real damages.
>
> I think that, just knowing the relationship she had with her husband and the role she plays with her husband the change in her husband's life, it clearly has impacted her; and I just think the record is replete with that. . . .
>
> I think that a substantial consortium award is appropriate. In an abundance of caution, she was given an amount of money[,] more than even requested [,] by the jury, so I do believe a small remittitur in that award is also appropriate. But I do think she suffered real damages, and I think it's appropriate that she receive a significant judgment.

After determining that the evidence supported an award of substantial damages to both plaintiffs, the trial court further considered the reasonableness of the jury's $30.4 million verdict by comparing it with the judgments in *Alcorn, Turbomeca,* and other cases involving remittitur. The court noted that remittitur generally had been approved in appellate cases where the remitted award was reasonably related to the actual damages. While *Alcorn* affirmed a remitted award that was eleven and a half times the actual damages, other cases suggested that a factor of five times the actual damages was reasonable for a reduced award. The court concluded the multiplier of five was most appropriate in Mr. McCormack's case because his injuries were different and not comparable to those at issue in *Alcorn*.[5]

We find no error in the trial court's consideration of other remittitur cases. The court did not apply a "standard of uniformity" or mathematical formula as the sole basis for the reduced award. The court properly considered the nature and extent of the injuries, the actual economic loss, the amount actually requested for Mrs. McCormack, and the extent to which the remitted award was within the range of similar cases. *Gomez,* 126 S.W.3d at 375. There was no violation of the constitutional right to a jury trial because the court reasonably determined the jury's verdict was excessive and did not arbitrarily calculate the remittitur. Moreover, the McCormacks knowingly waived this fundamental right by accepting the remitted award in lieu of a new trial.

5. The plaintiff in *Alcorn*, 50 S.W.3d 226, suffered immediate substantial injuries in a train accident. She had more than twenty broken bones, significant blood loss, and a traumatic head injury. *Id.* at 234. During several weeks of hospitalization, she went into cardiac arrest and lapsed into a coma. *Id.* Her permanent injuries included diminished vision, chronic pain, cognitive deficit, and the inability to care for herself. *Id.*

The McCormacks also contend the trial court erred in granting remittitur because the jury's verdict was supported by evidence of Mr. McCormack's injuries. Thus, they argue the $30.4 million award was not excessive or against the weight of the evidence. Their argument on appeal includes a recitation of all the evidence indicating the severity of Mr. McCormack's brain damage and the permanency of his resulting disability. As compared to our review of the record, the trial court was in the best position to observe this evidence and evaluate credibility. Under our standard of review, "[t]he trial court's superior vantage point warrants a great latitude of discretion in determining whether and to what extent the verdict was supported by the evidence." *Id.* at 376. We must defer to the trial court's exercise of discretion unless the remitted judgment is manifestly unjust. *Id.* at 375.

None of the evidence persuades us that remittitur of the $30.4 million verdict was manifestly unjust. There is no dispute that Mr. McCormack's actual economic loss was in the range of $1.4 million to $1.7 million. The remitted negligence award of $7.7 million included the actual loss and a five-fold multiplier for pain, suffering, and other intangible losses. By contrast, the jury's award was at least seventeen times Mr. McCormack's economic loss and clearly exceeded the range of awards deemed reasonable in similar cases. The remittitur also fully compensated Mrs. McCormack based on her request for loss of consortium. The McCormacks' challenges to the remitted judgment are denied, as we find no abuse of the trial court's discretion.

### B. PREJUDGMENT INTEREST

The McCormacks contend the trial court erroneously applied Section 408.040.2 in denying their request for prejudgment interest. The statute provides:

> In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest ... shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier.

§ 408.040.2.

In this tort action, the McCormacks assert they met the requirements of the prejudgment interest statute by making a $1.5 million settlement offer to Capital on December 19, 1997. The offer was in writing, sent by certified mail. On December 24, 1997, Capital's president rejected the offer, stating: "I have no intention of making any offer of settlement or to correspond with you further." After the second jury trial and entry of the remittitur judgment, the McCormacks sought prejudgment interest dating from December 24, 1997, because the $8.9 million judgment clearly exceeded the $1.5 million settlement offer rejected by Capital.

The trial court denied the McCormacks' claim for prejudgment interest because the first jury trial had resulted in a $256,000 verdict that did not exceed the settlement offer. The court concluded it would be "unfair" to apply Section 408.040.2 because the low verdict in the first trial did not put the defendant "on notice" that a subsequent trial could result in a verdict in excess of the settlement offer.

Our review of the trial court's refusal to award prejudgment interest involves the interpretation of Section 408.040.2. Whether a statute applies to a given set of facts is a question of law. *McKinney v. State Farm Mutual Ins.*, 123 S.W.3d 242, 245 (Mo.App.2003). Matters of statutory construction and application are reviewed *de novo*, without deference to the trial court's judgment. *Id.*

The primary rule in statutory construction is to ascertain the legislative intent from the words used, considering the words in their plain and ordinary meaning. *Hurst v. Jenkins*, 908 S.W.2d 783, 786 (Mo.App.1995). In that regard, Section 408.040.2 provides that a prevailing tort claimant is entitled to prejudgment interest if: (1) the claimant made a demand for payment or offer of settlement, which was left open for sixty days; and (2) the amount of the judgment exceeds the claimant's demand or settlement offer. If these conditions are met, the claimant "shall" be awarded prejudgment interest. § 408.040.2. The interest begins to accrue sixty days after the offer was made or when the offer was rejected without counter-offer, whichever is earlier. *Id.*

■ The plain language of Section 408.040.2 does not allow the trial court discretion to deny prejudgment interest once the statutory conditions are met. See *Harrison v. King*, 7 S.W.3d 558, 562 (Mo.App.1999) (statutory use of the word "shall" evidences legislative intent to remove discretion in trial court's disqualification of guardian *ad litem*). The fairness of the award is not a relevant consideration. Nor does the statute suggest that the defendant is entitled to notice of the likely amount of a jury's verdict. The defendant is only entitled to written, certified mail notice of the settlement demand or offer.

■ Our courts have recognized that Section 408.040.2 serves two public policies: (1) it compensates claimants for the true cost of money damages they have incurred due to the delay of litigation; and (2) it promotes settlement and deters unfair benefit from the delay of litigation. *Brown v. Donham*, 900 S.W.2d 630, 633 (Mo. banc 1995). In light of these purposes, the settlement demand is the only notice that matters under the statute. The statute does not refer to nor give any weight to intervening events between the demand and the final judgment. Once a settlement demand is made pursuant to Section 408.040.2, "it is immaterial whether plaintiff made any subsequent offers of settlement." *Lester v. Sayles*, 850 S.W.2d 858, 874 (Mo. banc 1993). Likewise, the statute gives no indication that a voided jury verdict affects the validity of the original settlement demand for purposes of seeking prejudgment interest.

■ When statutory language is clear, we must give effect to the language as written. *Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 449 (Mo. banc 1998). A court may not add words or requirements by implication to a statute that is not ambiguous. *Id.* The statute is clear that the McCormacks are entitled to relief under Section 408.040.2 if their written settlement demand was sent by certified mail and was exceeded by the judgment.

■ Capital disputes that the McCormacks satisfied the two conditions necessary for a prejudgment interest award. First, it argues the settlement offer was an aggregate demand of $1.5 million for both plaintiffs and, therefore, did not strictly comply with Section 408.040.2. However, as the Supreme Court held in *Call v. Heard*, 925 S.W.2d 840, 854 (Mo. banc 1996), there is nothing in the prejudgment interest statute to preclude plaintiffs from combining demands on multiple personal injury claims into a single settlement offer.

The McCormacks' written, certified mail settlement offer of $1.5 million met the first requirement for a prejudgment interest award.

 Capital also contends the settlement offer was invalid after the first jury trial resulted in a verdict of $256,000. Capital argues the McCormacks would only be entitled to prejudgment interest if they had submitted a second settlement offer after the court ordered a new trial. Again, we find nothing in the statute to support such a requirement. The decision to grant a new trial nullified the first verdict. *Century Fire Sprinklers, Inc. v. CNA/Transp. Ins. Co.*, 87 S.W.3d 408, 423 (Mo.App.2002) (reversal on appeal renders the first judgment null and void); *Norris v. Nationwide Mut. Ins. Co.*, 55 S.W.3d 366, 370 (Mo.App.2001) (once a motion for new trial is rendered, the case is left for trial *de novo* as though there had been no trial). The case reverted to its pretrial status and, just as the parties were not required to submit new pleadings, the McCormacks were not required to submit a new demand letter. Despite successive trials, the December 1997 settlement offer remained valid for purposes of determining prejudgment interest.

 Capital further suggests that the second requirement for prejudgment interest was not met because Mrs. McCormack's remitted award of $1.2 million did not exceed the settlement demand of $1.5 million. Although an aggregate settlement demand on multiple claims is valid to meet the first requirement of Section 408.040.2, the failure to apportion the settlement between claims can adversely affect proof of the second element.

In *Lester v. Sayles*, a jury awarded $19.817 million on a negligence claim brought on behalf of a four-year old child injured in a truck accident. 850 S.W.2d at 862. The child's mother was awarded $1.674 million on her claims for medical expenses and loss of consortium. *Id.* The trial court awarded prejudgment interest because the judgment exceeded the plaintiffs' aggregate settlement demand of $950,000. *Id.*

On appeal, the award on the mother's claims was affirmed, but the child's negligence judgment was reversed and remanded for new trial. *Id.* at 874. The appeals court also affirmed the mother's entitlement to prejudgment interest because her award exceeded the $950,000 settlement demand. *Id.* In its remand instructions, the court noted that the child would also be entitled to prejudgment interest if her verdict, on retrial, exceeded $950,000. *Id.* Due to the plaintiffs' failure to apportion their settlement demand between their separate claims, the court declined to speculate whether the child would be entitled to any prejudgment interest if she was awarded a judgment under $950,000. *Id.*

The Supreme Court's decision in *Lester* suggests that claimants who fail to distinguish and allocate their claims in a settlement demand, do so at their own peril in satisfying the conditions for prejudgment interest. The claimants' failure to apportion the demand between their separate claims makes it impossible for the trial court to determine how much was demanded for a particular claim. *Id.* In such cases, the trial court can reasonably determine that any claimant who does not receive an award in excess of the settlement demand has not satisfied the second element required for prejudgment interest.

 Mr. McCormack is entitled to prejudgment interest because his award of $7.7 million exceeded the properly tendered settlement demand of $1.5 million under Section 408.040.2. By our calculations, interest is due on the award at the statutory rate of nine percent per annum

for the period of December 24, 1997 through judgment entry on June 12, 2003, for a total interest amount of $3,789,655. § 408.020. Mrs. McCormack is not entitled to prejudgment interest because her award of $1.2 million did not exceed the settlement demand.

Finally, Capital argues that even if the trial court erred in denying prejudgment interest on grounds of unfairness, the denial should be affirmed because Section 408.040.2 violates constitutional standards of due process and equal protection. Specifically, Capital contends the statute "lacks any procedural safeguards and operates against tort defendants who must answer a demand when the potential damages are uncertain."

█ As a preliminary matter, we must determine our jurisdictional authority to consider this constitutional challenge. By virtue of Article V, § 3 of the Missouri Constitution, the Supreme Court has exclusive jurisdiction in all cases involving the constitutional validity of a state statute. However, the mere assertion that a statute is unconstitutional does not deprive the court of appeals of jurisdiction. *Wright v. Mo. Dep't. of Soc. Servs.*, 25 S.W.3d 525, 528 (Mo.App.2000). The constitutional issue must be real and substantial, not merely colorable. *Id.*

█ In determining whether a constitutional claim is real and substantial, we make a preliminary inquiry as to whether it presents a contested matter of right that involves fair doubt and reasonable room for disagreement. *Id.* If the initial inquiry discloses the claim is so legally or factually insubstantial as to be plainly without merit, the claim may be deemed merely colorable. *Id.* We conclude, for reasons set forth herein, that Capital's constitutional challenge is merely colorable and does not invoke the Supreme Court's exclusive jurisdiction.

The McCormacks notified Capital of their intent to seek prejudgment interest in the settlement offer of December 19, 1997. The letter from their counsel states: "This offer is made pursuant to Section 408.040 Revised Statutes of Missouri and will remain open for sixty (60) days from the date received unless rejected earlier." Capital rejected the offer on December 24, 1997, and declined to make a counter offer. On September 30, 1998, the McCormacks filed a First Amended Petition that specifically prayed for prejudgment interest and referenced Section 408.040. Capital filed a responsive pleading that did not mention prejudgment interest, nor challenge the constitutionality of Section 408.040.

█ Capital concedes it did not assert a constitutional challenge to prejudgment interest until after the second trial, when it filed a Motion to Amend the Judgment. "An attack on the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an afterthought in a post-trial motion or on appeal." *Land Clearance for Redevelopment Auth. v. Ks. Univ. Endowment Ass'n,* 805 S.W.2d 173, 176 (Mo. banc 1991). "Constitutional issues are waived unless raised at the earliest opportunity, consistent with orderly procedure." *Hollis v. Blevins,* 926 S.W.2d 683, 683 (Mo. banc 1996).

Capital had ample notice that the McCormacks intended to seek prejudgment interest, and yet it failed to raise any constitutional challenge to the statute at an earlier stage that would have allowed the trial court a full opportunity to identify and rule on the issue prior to the entry of judgment. Given the waiver, the trial court properly declined to consider the issue in ruling on the motion to amend judgment. By waiting until the post-trial

motion, Capital also failed to preserve the constitutional challenge for consideration on appeal. *Land Clearance,* 805 S.W.2d at 176.

### III. CONCLUSION

The trial court's denial of prejudgment interest on Mr. McCormack's award of $7.7 million is reversed. Pursuant to Rule 84.14, judgment is entered for prejudgment interest in the amount of $3,789,665. In all other respects, the judgment is affirmed.

All concur.